783 A.2d 224

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Joel CHASNOFF.**

**Misc. Docket AG No. 13 Sept. Term, 2000.**

Court of Appeals of Maryland.

Oct. 15, 2001.

Melvin Hirshman, Bar Counsel and Delores O. Ridgell, Asst. Bar Counsel for Atty. Grievance Com'n of Maryland, petitioner.

Pamela A. Bresnahan, Washington, DC, for respondent.

Argued before BELL, C.J., ELDRIDGE, WILNER, CATHELL, HARRELL, BATTAGLIA, and LAWRENCE F. RODOWSKY (retired, specially assigned), JJ.

LAWRENCE F. RODOWSKY, Judge (Retired, Specially Assigned).

The respondent, Joel Chasnoff (Chasnoff), was admitted to the bar of this Court on October 30, 1970. He also has been admitted to the District of Columbia bar. In May 2000 the Attorney Grievance Commission filed a petition for disciplinary action against Chasnoff, charging numerous violations of the Maryland Rules of Professional Conduct (MRPC). These included MRPC 1.1 (failure to act with competence); MRPC 1.3 (failure to act with diligence); MRPC 1.4 (failure to communicate with client); MRPC 1.5 (charging an excessive fee); MRPC 1.15(a) (failure to escrow unearned fees); and MRPC 8.1(b) (knowing failure to respond to a lawful demand of Bar Counsel). The charges involved three clients. This Court referred the charges to Judge James C. Chapin of the Circuit Court for Montgomery County for hearing and a report.

The hearing before Judge Chapin consumed three full days. One hundred eighty exhibits were introduced. Chasnoff represented himself. Bar Counsel called as witnesses two of the

three complainant clients, Robert H. Weinfeld, M.D. (Weinfeld) and Frank J. Errera (Errera), as well as Sterling Fletcher, an investigator for the Attorney Grievance Commission. Bar Counsel also called Chasnoff as an adverse witness to testify as to matters involving the third client, Robin Robinson (Robinson), whose testimony before the Inquiry Panel was introduced in evidence. Chasnoff's defense case-in-chief principally consisted of marking into evidence seemingly every piece of paper remaining in his files on the three clients' matters. Judge Chapin found that Chasnoff's acts and omissions constituted professional misconduct in each of the particulars charged in the petition for disciplinary action.

Chasnoff, continuing to act pro se, filed exceptions to Judge Chapin's report. In his exceptions Chasnoff primarily reiterated his version of the facts. Thereafter, but prior to the argument in this Court, Chasnoff engaged his present counsel who filed on his behalf a memorandum with an attached psychiatric evaluation and recommendation. At argument in this Court Bar Counsel submits that the appropriate sanction is disbarment, while Chasnoff sees as appropriate a suspension of no more than sixty days which would be stayed subject to Chasnoff's compliance with special conditions.

In this opinion we shall separately address the three clients' cases, then consider the failure to cooperate with Bar Counsel together with Chasnoff's claimed mitigation, and conclude with the sanction.

## I. Weinfeld's Case

Weinfeld, an obstetrician and gynecologist, was receiving substantial disability payments as a result of a broken neck suffered in 1994. One-half of those payments had been awarded to his former third wife as marital property pursuant to the terms of their Nevada divorce. Weinfeld's separation agreement with his former second wife provided that, if his annual income was involuntarily reduced to $250,000 or less due to his disability, he and his second wife would renegotiate his alimony obligations under the separation agreement, and failing resolution by agreement, Weinfeld could apply to a

court for such a resolution. Weinfeld petitioned the Circuit Court for Howard County to reduce his alimony.

The Howard County litigation involved nine hearings over three years. Three lawyers who had been representing Weinfeld in that litigation struck their appearances before trial. The ninth hearing, held on September 15, 1997, before a master and at which Weinfeld appeared pro se, was on his post-trial motion claiming a denial of due process in being required to proceed pro se at the trial. At the conclusion of that hearing the master orally placed on the record his recommendation that the plaintiff's motion to modify alimony be denied. Weinfeld, acting pro se, filed exceptions to the master's recommendations on September 26, 1997.

The Circuit Court for Howard County, by an order entered October 9, 1997, dismissed Weinfeld's exceptions. That order recited the reason for the dismissal as set forth below:

"The Plaintiff filed exceptions ... more than 5 business days after the verbal recommendations of the Master in Chancery as required by the provisions of Rule 9–207(d) MRP (*Morales v. Morales*, 111 Md.App. 628, 683 A.2d 1124 (1996))."

Former Maryland Rule 9–207(d) (now Maryland Rule 9–208(f) establishing a 10 day requirement) provided in relevant part that "[w]ithin five days after recommendations are placed on the record or served pursuant to section (c) of this Rule, a party may file exceptions with the clerk." *Morales* held that "[o]nce the master orally delivers his recommendations on the record, the parties are on notice of the recommendations, and the time for filing [exceptions] begins to run." *Id.* at 633, 683 A.2d at 1126. Also on October 9, 1997, the circuit court entered judgment denying any reduction in alimony.

Weinfeld, acting pro se, on October 21, 1997, filed a notice of appeal which he titled, "Application for Leave to Appeal to the Court of Special Appeals." That eight page document raised at least fifteen separate arguments attacking the decree.

Weinfeld contacted Chasnoff in January 1998 concerning prosecution of the appeal from the judgment of dismissal

(hereafter "Appeal 1"). Prior to their meeting, Weinfeld sent Chasnoff a letter dated January 8, 1998, enclosing a number of documents, including the orders dismissing exceptions and entering judgment which would be the subjects of Appeal 1.

Judge Chapin made the following findings of fact with respect to Weinfeld's matter.

"[Chasnoff] met with Weinfeld on January 26, 1998 for approximately two hours, at which time Weinfeld retained [Chasnoff] to provide legal advice and assistance, including the preparation of a brief and oral argument for Appeal 1. A written retainer agreement was executed, which provided for payment of $25,000 to be billed at $250 per hour. Weinfeld paid $21,500 with credit cards on that date, with the $3,500 balance to be payable in seven monthly payments of $500 each. [Chasnoff] received the full $25,000 pursuant to this payment agreement. Weinfeld's understanding of the agreement was that [Chasnoff] would charge him $250 per hour, which would be deducted from the retainer and that he would receive a refund of any unearned fees. [Chasnoff] testified that he considered the $25,000 a minimum payment and earned when received.[1]

"Promptly upon retaining [Chasnoff], Weinfeld sent to [Chasnoff] the transcripts of the eight hearings involved in the underlying case regarding Appeal 1.[2] [Chasnoff] was to prepare and file a brief for this appeal, but he never did so, despite the 100 hours or so he claims he spent in preparation thereof after filing several motions to extend. Two

---

1. Chasnoff's form retainer agreement in part read as follows:
 "I [i.e., the client] acknowledge and agree that no part of any fees paid to Joel Chasnoff will be refunded and the retainer is deemed earned when paid."
 This provision is not defensive to a disciplinary charge of violating MRPC 1.5 (excessive fees) to the extent that the "nonrefundable" retainer represents work that has not been performed. *See Attorney Grievance Comm'n v. Briscoe*, 357 Md. 554, 565 n. 13, 745 A.2d 1037, 1043 n. 13 (2000).

2. The testimony at the ninth hearing, that of September 15, 1997, had not yet been transcribed.

days before the brief was due, [Chasnoff] informed Weinfeld during a telephone conversation that he was not going to file the brief, because doing so would be a waste of time. In fact, [Chasnoff] never responded to an Order to Show Cause issued by the Court of Special Appeals on May 1, 1998. Weinfeld, however, was not aware that the failure to file the pleading would result in the dismissal of his appeal. Rather, he was under the impression that the appeal would still go forward and that [Chasnoff] would present an oral argument on his behalf. The client was not informed in writing or with enough detail to fully advise him that the appeal would be dismissed. [Chasnoff] contends that his failure to respond was due to his inability to come up with an argument, in light of the case of *Morales v. Morales*, 111 Md.App. 628, 683 A.2d 1124 (1996), which was controlling on the issue at hand and cited by the Court of Special Appeals in its Order to Show Cause. Petitioner asserts that a diligent review of the documents sent by Weinfeld in January or a prompt review of the court file would have brought this issue to [Chasnoff's] attention much sooner. The Court agrees with Petitioner and finds by clear and convincing evidence that [Chasnoff] failed to act with reasonable diligence and promptness in his representation of Dr. Weinfeld in violation of Rule 1.3, *supra*.

"In addition to Appeal 1, Weinfeld expected [Chasnoff] to protect his rights to appeal an anticipated Circuit Court ruling in the related contract case (Appeal 2). In this regard, Weinfeld delivered to [Chasnoff] a Notice of Appeal he prepared himself, and he instructed [Chasnoff] to file the notice for him while he was out of the country in February 1998. The ruling did not occur until August 7, 1998, and [Chasnoff] filed the Notice of Appeal at the last minute on September 8, 1998. Weinfeld was unaware that [Chasnoff] had filed the Notice of Appeal, and [Chasnoff] took no further action on Appeal 2. That same month, Weinfeld filed a complaint against [Chasnoff] with the Petitioner.

"Throughout the course of [Chasnoff's] representation of Weinfeld's appeals, Weinfeld had difficulty getting in touch

with [Chasnoff]. Weinfeld sent [Chasnoff] several letters requesting answers to specific legal questions pertaining to his appeals, but [Chasnoff] did not bother to answer those letters. Weinfeld frequently tried calling [Chasnoff] to inquire about the status of his legal affairs, but his numerous messages were often unreturned. [Chasnoff] claimed that he tried to reach Weinfeld on several occasions but was unable to do so because of his client's frequent travels. Weinfeld, however, testified that he always left a forwarding phone number, address, or other method of contacting him whenever he was away. Weinfeld's version of the facts is simply more credible, particularly given the testimony of the other complainants and the fact that [Chasnoff] even ignored Petitioner's letters and phone calls.

"Weinfeld undoubtedly did not receive the services he paid [Chasnoff] to provide. [Chasnoff] unilaterally terminated his representation of Weinfeld with regard to Appeal 1 by deciding not to file the brief just two days before the answer to the Order to Show Cause was due.... [Chasnoff] did not give his client reasonable notice to employ other counsel regarding Appeal 1 [in violation of MRPC 1.16(d)]. In fact, Weinfeld was not even aware that his rights to appeal were lost by [Chasnoff's] failure to file the brief. This rule also requires that any unearned portion of a prepaid fee be returned to the client, however, [Chasnoff] has not refunded any portion of the $25,000 that Weinfeld paid. The Court finds clear and convincing evidence that [Chasnoff] violated Rule 1.16 as well as Rule 1.5(a), Fees.... The fee [Chasnoff] charged was not reasonable in light of the amount of work performed, the results obtained, and the complexity involved. [Chasnoff] testified that he deposited the fees paid by Weinfeld directly into his own account, as was his customary practice, because he was unaware at the time that this is a practice prohibited by [MRPC 1.15 (Safekeeping Property)].... By clear and convincing evidence, [Chasnoff] also violated Rule 1.15, because [Chasnoff] did not maintain the prepaid fees in an escrow

account until earned, nor did he provide an accounting to Weinfeld for these funds."

Chasnoff's pro se exceptions do not meet the substance of the violations found by Judge Chapin in the Weinfeld matter, and we overrule the exceptions. In this Court Chasnoff, citing to Judge Chapin's written report, submits that he "spent approximately 100 hours reviewing the transcripts, preparing and filing the motions to extend and reviewing and analyzing the law in order to address the various issues that Dr. Weinfeld had presented to him." What Judge Chapin said was that Chasnoff never filed a brief in Appeal 1 "despite the 100 hours or so he *claims* he spent in preparation thereof. . . ." (Emphasis added). In light of the record, we read the sentence on which Chasnoff relies to be a statement of Chasnoff's position and not a finding by Judge Chapin that Chasnoff did in fact spend 100 hours on Weinfeld's matter.

Cross-examination of Chasnoff by Bar Counsel revealed that on February 27, 1998, Weinfeld faxed Chasnoff the notice from the Court of Special Appeals advising that the appellant's brief was due March 16. Chasnoff, referring to his "incomplete time slips" testified that he did not see himself "doing too much" on Appeal 1 prior to March 16. Chasnoff did not obtain the transcript of the September 15, 1997 hearing until April 15, 2000, necessitating two extensions of the time for filing Weinfeld's brief as appellant. Chasnoff's time records for April 26 reflect four entries totaling fourteen hours charged to Weinfeld. Time records for April 27 charged blocks of thirteen hours and three hours, for a total of sixteen hours. Entries for April 28 reflect two blocks of time charged to Weinfeld, each of thirteen hours. Chasnoff said the second entry was a duplication. The time records for April 29 charge a block of thirteen hours and then another block of thirteen hours, which Chasnoff testified was also a duplicate entry. The time records for May 1 charge one and one half hours for the preparation of the third brief filing extension, which moved the deadline to May 11 and a second entry on May 1 charging a block of thirteen hours for review of documents. We doubt that Judge Chapin intended his reference to a

claimed 100 hours to be more than a statement of Chasnoff's position.

## II. Errera's Case

Errera, a computer consultant, was injured on December 7, 1993, when he was fifty-nine years old, in a fall at Dulles Airport. While leaving the terminal building Errera and his wife came to an area that was under construction. He encountered a "set of barriers" similar to, but lower than, the barriers commonly erected outside of supermarkets in order to confine carts to the premises. Errera described the accident to Judge Chapin as follows:

"At first glance you look and you can recognize that it's too low to get your suitcases underneath so you have to lift your suitcases over this barrier to get through.

"I found out later the barriers were not smooth. In going through the barriers, a bag which I was carrying caught on the barrier and then released, and the suitcase that was in my left arm came around, hit me in the chest, and as a result fractured four ribs and did a few other things to my internal organs."

He went "head over heels with the luggage."

Judge Chapin made the following findings of fact:

"After unsuccessful attempts on his own to reach the airport and determine the responsible party, Errera [on December 20, 1993] engaged [Chasnoff] to file a claim against the responsible party. [Chasnoff] and Errera entered into a contingency fee arrangement, which provided that [Chasnoff] would receive 33 1/3% of any recovery if the matter was settled before [suit] and 40% if [suit were filed]. Because [Chasnoff] was not admitted to practice law in Virginia (the state where the accident occurred), he made arrangements with Paul Capello, a member of the Virginia Bar, to join him in representing Errera.

"[Chasnoff] told Errera during their first meeting that he would visit the scene of the accident, take photographs of the conditions as they existed at the time of the accident,

and try to locate the sky cap that assisted him to his car on the night of the accident. [Chasnoff] did not even go to the scene to take pictures until May 1995, and he never attempted to locate the sky cap or any other possible witnesses. According to a letter written by Errera to [Chasnoff] in June 1994, the scene of the accident had already changed by that time. Errera's wife witnessed the accident, but [Chasnoff] never made any attempt to depose her or otherwise preserve her testimony. Mrs. Errera was taken ill in April of 1994, and she died soon after on June 24, 1994.

"On the last possible day in December 1995 before the two-year statute of limitations would bar the claim, [Chasnoff] filed a suit in the Circuit Court for Fairfax County, Virginia. Although Errera was aware that Capello was also on the case, Errera dealt strictly with [Chasnoff], to whom he looked for advice and to protect his interests. Errera consulted with [Chasnoff] to provide discovery information when requested. However, [Chasnoff] failed to timely comply with the defendant's discovery requests on multiple occasions, which resulted in at least two Motions to Compel Discovery filed by opposing counsel. Capello warned [Chasnoff] numerous times that the case was in imminent danger of being dismissed due to failure to provide discovery, and he threatened to withdraw from the case. Capello also reminded [Chasnoff] about important upcoming dates, such as the deadline to identify experts, and he offered to assist [Chasnoff]. Unfortunately, [Chasnoff] did not take Capello up on his offer.

"In the months following the accident, Errera . . . continued to be in pain. In March of 1994, he met with an orthopedic surgeon, Dr. Thorp, who prescribed stronger medication, recommended exercises, and advised Errera that he could not pursue his normal job, because it required him to sit at a computer for long hours. By June of 1994, Errera's condition had improved to the extent that he could drive short distances, but he was still unable to sit at his computer for more than two hours at a time. On February 25, 1996, Errera found out that Dr. Thorp was moving to

Oregon during a visit to the doctor for treatment of a shoulder problem. Shortly thereafter, Errera advised [Chasnoff] that Dr. Thorp was moving out of the area so that [Chasnoff] could obtain any necessary information from the doctor about Errera's injuries before he moved. [Chasnoff] took no action to preserve Dr. Thorp's testimony. In fact, [Chasnoff] did not propound a letter written by Dr. Thorp on March 10, 1994 to [Chasnoff] regarding Errera's condition to opposing counsel during the discovery period. Among other things, the letter confirmed that Errera was experiencing soreness in his neck in addition to pain from the contusion in his chest wall. The letter also documented Dr. Thorp's recommendation that Errera avoid sitting for prolonged periods at a computer terminal. Due to [Chasnoff's] failure to provide this letter in discovery, the defendant's doctor, Dr. Conant, did not have this information when he evaluated Errera in October of 1998. Dr. Conant found no causal relationship between the accident and Errera's condition.

"In 1997, [Chasnoff] suggested to Errera that he see Drs. Charles Mess and Francis Mayle, because Errera continued to be in pain. Prior to this time, Errera had x-rays, which showed an abnormality in his neck. However, since four years had lapsed since the accident, the doctors could not causally connect the abnormality to the accident. In addition to Drs. Mess and Mayle, [Chasnoff] named John Gooch as an expert who opined that the exit on the day of Errera's accident did not comply with legal standards. Gooch did not examine the scene until January 1996, after the scene had changed and the barriers involved were no longer present, but Gooch based his opinion from the markings on the pavement that indicated where the pipes had been. The defendant filed a motion in limine to preclude these experts from testifying at trial, since [Chasnoff] failed to provide their names in a timely manner and had not provided enough detail regarding Gooch's testimony. The motion in limine excluding the experts was granted on November 6, 1998. On November 20, 1998, [Chasnoff] and Capella rec-

ommended to Errera that he accept a $4,000 offer. His litigation costs alone exceeded $10,000, but he was warned by his counsel that if he did not settle, he could be forced to pay the costs of the opposing party, $25,000 to $30,000. Errera took this advice and settled, despite the fact that at the onset of the litigation, [Chasnoff] demanded $350,000 from the putative defendants. By the time the $4,000 settlement offer was made, all of the defendants except the airport authority had been dismissed from the case. However, Errera was under the impression that the engineering and contracting companies responsible for the construction were still in the lawsuit at the time of the settlement. Errera received $1,024 from the settlement on July 9, 1999 along with a statement entitled "Accounting," which listed the disbursements from the settlement proceeds. This statement also included a disclaimer, which purported to release [Chasnoff] from all liability. According to Errera, [Chasnoff] insisted that Errera sign this document without explaining this provision and without suggesting that Errera seek independent counsel."

■ Obviously, proof of liability in Errera's case was problematic, an evaluation which Capello confirmed from the standpoint of Virginia law. Nevertheless, having determined to undertake the matter, Chasnoff had the duty to proceed competently and with diligence. In this regard Judge Chapin said:

"The court finds by clear and convincing evidence that [Chasnoff] did not act with the skill, thoroughness and preparation reasonably necessary to represent Errera. Indeed, [Chasnoff] did not even visit the scene of the accident until some two years after the fact. He did not attempt to locate the employee who assisted Errera on the night of the accident. He did not attempt to preserve the testimony of Mrs. Errera and Dr. Thorp. He did not see to it that Errera have his medical condition monitored in order to document that it was not improving. [Chasnoff] did not even act with the diligence necessary to ensure that the witnesses he did name were able to testify at trial. There is

no question that [Chasnoff] violated both Rule 1.1 [duty to act with competence] and Rule 1.3 [duty to act diligently]."

These findings are supported by the evidence. Chasnoff's exceptions to these findings are denied.

 Judge Chapin further found Chasnoff had failed to communicate with his client in violation of MRPC 1.4. Specifically, Judge Chapin found the following:

"Errera testified that he tried to communicate with [Chasnoff] about his case from May 1998 until late September 1998 but was unable to reach him. [Chasnoff] also failed to adequately explain the facts regarding his case to the extent necessary to allow Errera to make fully informed decisions, and [Chasnoff] failed to advise Errera that he maintain a medical record of his pain and inability to sit for prolonged periods of time. In fact, Errera was still under the impression that he would be awarded a large settlement, even after Drs. Mess and Mayle failed to find that Errera's medical problems were related to the accident. It was not until the eleventh hour that Errera was advised that he did not have a case and that if he insisted on going to trial, he was at risk of having to pay opposing counsel fees. Clearly, [Chasnoff] failed to keep Errera reasonably informed about the status of his case. In addition, [Chasnoff] did not explain the release clause he presented to Errera along with his share of the proceeds of the settlement."

These findings are supported by the evidence. Chasnoff's exceptions to these findings are denied.

The petition for disciplinary action also charged Chasnoff with a violation of MRPC 1.5(e) in the Errera matter. That subsection reads as follows:

"(e) A division of a fee between lawyers who are not in the same firm may be made only if:

"(1) the division is in proportion to the services performed by each lawyer or, by written agreement with the client, each lawyer assumes joint responsibility for the representation;

"(2) the client is advised of and does not object to the participation of all the lawyers involved; and

"(3) the total fee is reasonable."

Judge Chapin reasoned that, inasmuch as there was no written agreement with the client whereby Chasnoff and Capello assumed joint responsibility, the division of the fee had to be "in proportion to the services performed by each lawyer," but, because Chasnoff "still provided the lion's share of services, it was impermissible to share the fee on a 50–50 basis."

This fall-down case resulted in nothing but a loss for the plaintiff and his attorneys. From the $4,000 settlement, counsel each received $800, and Errera netted $1,042.69 after payment of open expenses totaling $1,357.31. This is not a factual situation to which MRPC 1.5(e)(1) was intended to apply. The purpose of the restrictions on fee splitting is "to avoid brokering in clients." C. Wolfram, *Modern Legal Ethics* § 9.2.4, at 510 (1986). In Restatement (Third) of the Law Governing Lawyers (2000), the restrictions on fee splitting are found in § 47.[3] In comment *b* to § 47 the American Law Institute sets forth the following rationale for the restrictions.

"The traditional prohibition of fee-splitting among lawyers is justified primarily as preventing one lawyer from recommending another to a client on the basis of the referral fee that the recommended lawyer will pay, rather than that lawyer's qualifications. The prohibition has also been defended as preventing overcharging that may otherwise result when a client pays two lawyers and only one performs

---

**3.** Restatement (Third) of the Law Governing Lawyers § 47 reads as follows:

"A division of fees between lawyers who are not in the same firm may be made only if:

"(1) (a) the division is in proportion to the services performed by each lawyer or (b) by agreement with the client, the lawyers assume joint responsibility for the representation;

"(2) the client is informed of and does not object to the fact of division, the terms of the division, and the participation of the lawyers involved; and

"(3) the total fee is reasonable (see § 34)."

services. Beyond that, the prohibition reflects a general hostility to commercial methods of obtaining clients."

In the instant matter the purported violation is that the referring lawyer did not receive a sufficiently high portion of the fee to be commensurate with the work he performed in relation to his Virginia colleague. The concern to which MRPC 1.5(e) is directed, however, is just the opposite—that the recommending lawyer will be paid for simply forwarding the business, without doing sufficient work to justify the fee split. Further, the $800 which each of the attorneys received in this case was exceedingly slim compensation if one considers only the time which each of the attorneys put into this contingent fee case. In any event, it was absolutely necessary for Chasnoff to have local counsel inasmuch as he was not admitted in Virginia. Contrary to Chasnoff's violating MRPC 1.5(e) by the equal division of $1,600, it would have been unprofessional for Chasnoff, in this loss situation, to attempt to foist a larger share of the loss on Capello by insisting that their relative services be calibrated. We sustain the exceptions to the finding of violation of MRPC 1.5(e).

## III. Robinson's Case

The Robinson matter involves preparation of a draft separation agreement. Chasnoff's engagement did not include negotiating the actual agreement; rather, it appears that he was to prepare the basis from which Robinson, or someone on her behalf, would undertake to bargain an actual agreement.

Judge Chapin's findings of violations were based on the facts set forth below.

"Robinson[ ] met with [Chasnoff] for one-and-a-half hours on October 7, 1997 and retained him to draft a separation agreement. The retainer agreement provided for a $3,500 retainer fee and an hourly rate of $250 per hour for time expended beyond fourteen hours. [Chasnoff] received the $3,500 retainer fee by the latter part of October 1997. Rather than depositing the funds into a trust or escrow account, [Chasnoff] deposited the money into his own account.

"Because she was planning to move to New York, Robinson requested that [Chasnoff] prepare a draft of the separation agreement by the beginning of November. Robinson had been married for two-and-a-half years, there were no children of the marriage, and the couple did not jointly hold any real property. The complainant's chief concern regarding the separation agreement pertained to a loan made by her parents to her husband. Robinson met with [Chasnoff] again on October 14, 1997 for one hour, at which time she provided [Chasnoff] with the documents he had requested at their initial meeting. [Chasnoff] met with Robinson once again on November 6, 1997 for one-and-a-half hours at [Chasnoff's] request. At this meeting, Robinson instructed [Chasnoff] that she wanted the agreement prepared by no later than the end of the year. At no time had [Chasnoff] indicated to Robinson that he would be unable to meet this deadline.

"In addition to [Chasnoff's] delay in providing his client with the settlement agreement, [Chasnoff] failed to respond to Robinson's repeated requests for a billing statement. Robinson requested a billing statement from [Chasnoff] in November and December, but she was not provided with one. Nor was she provided with the draft agreement, as promised by [Chasnoff]. [Chasnoff] and Robinson met yet again on January 15, 1998 for 1.33 hours, at which time they went over the same matters discussed previously. [Chasnoff] promised Robinson that the agreement would be completed by January 17, 1998. Again, [Chasnoff] failed to meet this deadline. On February 11, 1998, Robinson delivered a letter at [Chasnoff's] office advising him that she was terminating his representation. The letter also stated that Robinson would return to his office on February 13, 1998 to obtain a billing statement and her file and that she would pay for the draft of the agreement if it were ready by that date. Robinson went to [Chasnoff's] office three additional times in February to obtain a billing statement and her file. Finally, on February 27, 1998, [Chasnoff's] secretary provided Robinson with a statement, which indicated that [Chas-

noff] earned the entire retainer except for $897.50, and Robinson was provided a check for that amount.

"[Chasnoff] did not provide Robinson with the draft settlement until March 3, 1998. The draft settlement agreement, which was prepared using a template, was incomplete and replete with inaccuracies. For example, the agreement contained boilerplate language erroneously reflecting that the couple had children."

■ Judge Chapin found that Chasnoff failed to act with diligence, in violation of MRPC 1.3, because

"[Chasnoff] was aware that time was of great importance to his client when he undertook this representation, but he fell far short of delivering to his client's expectations, even though the settlement agreement did not contain any particularly complex or novel issues."

Finding a violation of MRPC 1.4 (duty to communicate), Judge Chapin explained as follows:

"Robinson repeatedly communicated her requests to [Chasnoff's] office for a billing statement and for information regarding the status of her separation agreement. Robinson was entirely reasonable in making these requests, particularly given the deadlines she had communicated to [Chasnoff] and the lack of compliance thereof."

In addition, Judge Chapin concluded that MRPC 1.5(a), requiring reasonable fees, had been violated because of the factors set forth below.

"The value of [Chasnoff's] services to his client dropped dramatically due to the unexplained passage of time between the first deadline and the date on which [Chasnoff] eventually delivered the agreement. Although [Chasnoff's] time records showed that he spent ten hours consulting with his client and preparing the agreement, Robinson did not receive the full value of this time spent, since the end result was incomplete and riddled with inaccuracies. Furthermore, [Chasnoff] spent a considerable amount of time covering the same material with his client during their several meetings that much of this time was, in effect, wasted."

These findings and conclusions are supported by the evidence. Chasnoff's exceptions are denied.

## IV. Spurning Bar Counsel

■ It is a violation of MRPC 8.1(b) for a Maryland lawyer knowingly to fail to respond to a lawful demand for information from Bar Counsel. Judge Chapin found that Chasnoff had violated that rule in the Weinfeld and Errera matters.

Bar Counsel's initial contacts with Chasnoff were by ordinary mail—on September 14, October 2, and October 28 in the Weinfeld matter, on September 23 in the Robinson matter,[4] and on November 19, 1998, in the Errera matter. Follow-ups by certified mail in the respective matters were sent on November 25, October 16, and December 21, 1998. Chasnoff made no written response. In late December 1998 the complaints were referred to an investigator who spoke with Chasnoff by telephone on January 5, 1999. Chasnoff explained that he was going through a very stressful period. The investigator urged Chasnoff to write or telephone Bar Counsel to explain his situation. Chasnoff did not follow up. The investigator telephoned again on January 13 and March 1 and was promised responses, but they were not forthcoming. The investigator followed up a telephone call of March 4 with a certified letter of March 5, 1999, urging a response to the Weinfeld complaint, but none was received. No substantive response to the complaints in the two matters charged was received from Chasnoff until November 1999.

Although finding that Chasnoff had violated MRPC 8.1(b), Judge Chapin made the following findings:

"[Chasnoff's] long time friend and office manager was seriously ill during this time period, which understandably caused [Chasnoff] a great deal of emotional stress. Regrettably, [Chasnoff's] emotional state deeply affected his ability to conscientiously represent his clients and caused him to turn a blind eye to Petitioner's requests for information.

---

4. Bar Counsel did not charge a violation of MRPC 8.1(b) in the Robinson matter.

[Chasnoff] acknowledged receiving Petitioner's lawful demands for information, and he did not refute Petitioner's assertion that he failed to respond to these demands."

In his exceptions filed May 17, 2001, Chasnoff explained that

"[t]he failure to respond to Bar Counsel was due to the fact that my Office Manager and long-time friend had, at the time of the filing of the grievance, been diagnosed with cancer and was seriously ill for a substantial period of time, all of which caused me great distress and to be away from the office assisting her, seeing doctors, and arranging for her future treatment."

His friend had undergone several surgeries and was unable to assist in the preparation of a response. He denied any intentional refusal to respond.

To his memorandum filed August 15, 2001, in this Court, Chasnoff has attached a "preliminary evaluation and recommendation," dated August 15, 2001, by a psychiatrist who evaluated Chasnoff at intervals on four days in July and August 2001. That healthcare provider concluded that Chasnoff was "presenting currently" with "[a]n adult situational adjustment reaction with mixed anxiety and depressive features triggered by the loss of his office manager with the current difficulties of coping with the allegations [of professional misconduct] as well as ongoing difficulties managing his law practice." The psychiatrist's report indicates that the friend's cancer reappeared in the fall of 1997, became progressive, and caused her to stop working in December 1998. Chasnoff became her caretaker and "became progressively immobilized and frozen." The psychiatrist recommends weekly therapeutic sessions and medication management and that Chasnoff continue practicing with a monitor.

■ Arguing from the premise that bar discipline proceedings are within the original jurisdiction of this Court, Chasnoff submits that we can consider the psychiatrist's report and that, based on it, a suspension of no more than sixty days should be imposed and then stayed, subject to Chasnoff's compliance with the conditions suggested by the psychiatrist.

Assuming, *arguendo,* that this Court has the power to take evidence directly and make our own findings upon it in bar discipline cases, we decline, as an exercise of discretion, to do so here. Chasnoff's past and present psychological condition, its onset, severity, and continuation, and the relationship between his condition and the violations that are before us present questions of fact, and of inferences from fact, that should have been presented to Judge Chapin, where cross-examination was available and rebuttal evidence could have been received. It is not appropriate for this Court to conduct a hearing of that type.

The exceptions to the findings of violation of MRPC 8.1(b) are denied. We recognize, however, as mitigating, Judge Chapin's finding that stress "deeply affected" Chasnoff's ability to practice "conscientiously" and "caused him to turn a blind eye" to Bar Counsel's requests.

## V. Sanctions

Chief Judge Bell, writing for the Court in *Attorney Grievance Comm'n v. Jeter,* 365 Md. 279, 778 A.2d 390 (2001), has recently reiterated the rules governing the imposition of sanctions.

"The purpose of disciplinary proceedings against an attorney is ... to protect the public rather than to punish the attorney who engages in misconduct. That purpose is achieved 'when sanctions are imposed that are commensurate with the nature and gravity of the violations and the intent with which they were committed.' In other words, a sanction is imposed to demonstrate to members of the legal profession the type of conduct that will not be tolerated. Thus, the facts and circumstances of the case before the Court inform the sanction to be imposed, that is, the nature and extent of the discipline imposed is dependent on the severity of the attorney's misconduct and the particular facts of the case."

*Id.* at 289–90, 778 A.2d at 396 (citations omitted).

Chasnoff committed a number of very serious violations. In the Weinfeld matter Chasnoff had in his possession the order

of dismissal by the circuit court before his first meeting with the client. That order explicitly set forth the apparently insuperable procedural barrier to any appeal. Nevertheless, Chasnoff undertook the representation, charging a $25,000 fee, $21,500 of which he immediately collected and treated as his personal funds. He did not tell his client of the apparently fatal procedural barrier until a few days before Weinfeld's brief was due, and then Chasnoff left Weinfeld with the impression that the appeal would proceed, but without a written brief.

Bar Counsel has chosen to attribute the client's loss to Chasnoff's lack of diligence, resulting in an excessive fee, and Judge Chapin has so found. Clearly, if Chasnoff, with diligence, had addressed the orders appealed from, the client either would have agreed to terminate the appeal (or Chasnoff's legal engagement) or the client would have proceeded after having been fully advised of the lack of prospects for success. Instead, Chasnoff did not advise Weinfeld of the barrier until, Chasnoff claims, he expended 100 hours on Weinfeld's legal matters. The loss to the client, in the form of an excessive fee, appears to be substantial. Chasnoff has never refunded any portion of the $25,000 that he ultimately collected.

Although the overcharge of Robinson is not nearly so great as that of Weinfeld, Chasnoff has not offered Robinson a refund of any portion of the excessive fee.

This Court views the repeated failures to respond to Bar Counsel for more than one year, after numerous requests for information, also to be serious violations. *See Attorney Grievance Comm'n v. Fezell,* 361 Md. 234, 254–55, 760 A.2d 1108, 1119 (2000) (agreeing with the hearing judge that "repeated refusal to comply with the requests of Bar Counsel demonstrate[s] a complete 'disregard of the spirit and intent of the Rules of Professional Conduct' "). Those failures are superimposed on a pattern of failures to represent clients with diligence. We recognize, as mitigating, Judge Chapin's findings that Chasnoff's emotional stress caused him to spurn Bar

Counsel's requests and adversely affected his representation of clients. A condition, however, that is so severe as to cause an attorney who has nearly thirty years standing at the bar and who has no prior disciplinary violations, repeatedly to ignore Bar Counsel's requests is, in itself, a matter for concern. In addition, it appears from the Errera matter that Chasnoff's failure to act with diligence in his clients' affairs antedated the period of his emotional stress over his friend's fatal illness.[5] Chasnoff's admitted ignorance of the requirement to escrow unearned fees is consistent with our concern.

Because we are not in a position to determine the weight, if any, to be given to the last minute, psychiatric report, and because it is not clear whether and to what degree monitoring will be appropriate or available, our duty to protect the public requires that we reject Chasnoff's proposal for continued practice, subject to monitoring and to psychiatric treatment.

Under all of the circumstances, the appropriate sanction in this case is an indefinite suspension, to begin thirty days from the date of the filing of this opinion. Any petition for reinstatement will be subject to Title 16, Chapter 700 of the Maryland Rules effective July 1, 2001.

*IT IS SO ORDERED. RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE BV 15 c FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST JOEL CHASNOFF.*

---

5. In this respect, Bar Counsel's exception to Judge Chapin's statement of the relevant period is sustained.