968 A.2d 678

**William BLONDELL**

v.

**Diane LITTLEPAGE.**

**No. 16, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

March 30, 2009.

---

124

126

Nathaniel Fick & Jonathan E.C. May (Fick & May, C. William Michaels, on the brief), Baltimore, for Appellant.

R. Scott Krause (Charles Martinez, Eccleston & Wolf, PC, on the brief), Hanover, for Appellee.

Panel: JAMES R. EYLER, MATRICCIANI and RAYMOND G. THIEME (Ret., specially assigned), JJ.

JAMES R. EYLER, Judge.

In this appeal, we consider whether the Circuit Court for Baltimore County properly entered summary judgment in favor of an attorney with respect to tort and contract claims brought by the attorney's co-counsel, based on actions taken in the course of their joint representation of a client. Appellant, William J. Blondell, Jr., Esq. ("Blondell"), was engaged by Lois A. and Hugh Jack Corbin (the "Corbins") to represent them with respect to their medical malpractice claim. Blondell filed a complaint and, at a later time, referred the matter to appellee, Diane M. Littlepage, Esq. ("Littlepage"). Both

continued to represent the Corbins pursuant to a fee sharing agreement. The agreement, which gave Littlepage primary responsibility in handling the matter, provided that Blondell would remain as co-counsel and provide services as requested by Littlepage.[1] Eventually, the Corbins settled the case, but for a sum less-than-anticipated by Blondell, based at least partially on their acceptance of Littlepage's advice that Blondell's delay in filing the complaint raised an arguably meritorious statute of limitations defense.

Following the settlement, Blondell brought claims against Littlepage for fraud/deceit, breach of contract, breach of fiduciary duty, negligence, and intentional interference with contractual relations. Blondell based his claims on allegations that Littlepage improperly advised the Corbins that there was an arguably meritorious limitations defense when the defense lacked merit, that Littlepage breached a duty to consult and communicate with him during settlement negotiations, and improperly advised the Corbins that they explore a legal malpractice action against him for the diminution in value of their claim based on his delay in filing their complaint. The circuit court granted Littlepage summary judgment on all counts, concluding that Littlepage owed no tort duty to Blondell, that Littlepage fulfilled her contractual duty, and that Littlepage, as a matter of law, could not have interfered with the contract between Blondell and the Corbins because she was a party to the agreement. The sole issue presented by Blondell on appeal is as follows:

> Was the circuit court legally correct in granting appellee's summary judgment motion on all claims by appellant against appellee, as co-counsel in a medical negligence matter, after appellee, without informing or consulting appellant, advised the clients to settle the matter by falsely stating to them that appellant had not timely filed their

---

1. The case caption includes Blondell and Littlepage individually, and the names of their respective law offices. We shall refer to the litigants in their individual capacities.

claim and had committed malpractice, necessitating an immediate settlement?

For the reasons that follow, we agree with the conclusions of the circuit court and, therefore, affirm the judgment.

## Facts and Proceedings

In May 1999, Doctor Amile A. Korangy performed a mammogram on Lois Corbin and reported no abnormalities in the results. Subsequently, in November 1999, Ms. Corbin detected a lump in her left breast. Ms. Corbin scheduled the first available appointment with her gynecologist, Doctor Dee Hubbard, who examined Ms. Corbin on January 18, 2000. Dr. Hubbard scheduled Ms. Corbin for another mammogram on January 19, 2000, and a sonogram on January 21, 2000, both of which returned results suspicious for malignancy. A subsequent biopsy confirmed that Ms. Corbin had breast cancer.

In approximately May 2000, the Corbins retained Blondell to pursue a possible claim for medical malpractice against Dr. Korangy, believing that he misread Ms. Corbin's May 1999 mammogram. On January 21, 2003, Blondell filed a medical malpractice claim against Dr. Korangy in the Health Claims Arbitration Office. The parties elected to waive arbitration, and on April 8, 2003, the Health Claims Arbitration Office transferred the case to the Circuit Court for Baltimore County.

In approximately January 2004, while the case was in early discovery, Blondell referred the Corbins' claim to Littlepage.[2] On January 15, 2004, the Corbins executed a document titled "Acknowledgment and Consent to Fee–Sharing Agreement" that stated:

> Pursuant to the applicable Rules of Professional Conduct, I/we, the undersigned, do hereby acknowledge that I/we have been advised by the law firm of Diane M. Littlepage, Esquire that the legal fee in my/our case will be shared between Diane M. Littlepage, Esquire and William Blondell,

---

**2.** Blondell had previously referred medical malpractice matters to Littlepage.

Esquire on the basis of the anticipated division of services to be rendered in the case. I/we understand that Diane M. Littlepage, Esquire, will have primary responsibility for the prosecuting my/our claim [sic], including handling court appearances and the trial of the case, should such become necessary, and that, William Blondell, Esquire will act as co-counsel in the case and will perform other services as requested by Diane M. Littlepage, Esquire. I/we hereby consent to the sharing of the fee and understand that the fee-sharing agreement will have NO effect on the overall fee to be charged in my/our case.

Blondell and Littlepage acknowledge that, while the writing did not address the specific division of the fee, they orally agreed to divide any contingency fee fifty-fifty. Littlepage entered an appearance on behalf of the Corbins. Though Blondell remained counsel of record, he had no further contact with the Corbins, and aside from a few sporadic discussions with Littlepage, was not asked to and did not actively partici-pate in the case from that point forward.

In March 2005, Dr. Korangy filed a motion for summary judgment, asserting that the claim was barred by the three-year statute of limitations, *see* Maryland Code (2006 Repl.Vol., 2008 Supp.), § 5–109(a) of the Courts and Judicial Proceedings Article, because Ms. Corbin was on inquiry notice no later than January 18, 2000, and the claim was not filed until January 21, 2003. Littlepage filed an opposition after discuss-ing the matter with Blondell. By order dated May 31, 2005, the circuit court denied Dr. Korangy's motion.

A pre-trial settlement conference was held in August, 2005. In a conversation before the conference, Blondell suggested to Littlepage that he accompany her to the conference because of his familiarity with the settlement judges. Littlepage did not object to Blondell's suggestion, but Blondell ultimately did not attend the conference.[3]

---

3. Blondell testified that he attempted to reach Littlepage a few days prior to the conference and on the day of the conference, without success.

According to Littlepage, the settlement judge advised her during the conference that "Dr. Korangy's limitations argument was compelling and that Dr. Korangy would likely prevail in making such an argument to the trial judge or on appeal." Dr. Korangy also indicated that he would appeal an adverse verdict on the limitations issue. Littlepage discussed the limitations problem in a conversation with Blondell following the settlement conference, but the pair had no further discussions regarding the settlement negotiations.[4]

As the September 12, 2005 trial date approached, Littlepage discussed with the Corbins various factors influencing a potential settlement, including Ms. Corbin's failing health, a scheduling conflict between the trial and Ms. Corbin's daughter's wedding, the cost the Corbins would incur in the event of a defense verdict, and the limitations issue. In addition, Littlepage stated her opinion that Blondell unnecessarily delayed filing their claim, thus creating an arguable limitations defense that diminished the value of their claim. Littlepage recommended that the Corbins consult with counsel regarding a possible malpractice claim against Blondell, and provided them with the names of attorneys that regularly handled such claims. The Corbins eventually decided to settle the claim against Dr. Korangy for $225,000, which was significantly less than the $1 million initially demanded by Littlepage, and the $350,000 recommended by the settlement judge.[5] Littlepage remitted one-half of the contingency fee to Blondell.

On December 18, 2006, Blondell filed a complaint against Littlepage, which contained counts alleging fraud/deceit,

---

4. Littlepage claimed that the settlement judge raised the possibility of a malpractice action against Blondell during the conference, but it is unclear from the record whether she informed Blondell of this fact in their conversation. Littlepage claimed that Blondell was nonetheless aware of a possible malpractice action against him. Blondell did not deny being aware of a potential malpractice claim, but contended that he was never informed of the comment by the settlement judge, nor did he believe the judge would have made such a comment.

5. The $1 million and $350,000 figures were provided by Blondell. Littlepage neither confirmed nor denied these amounts.

breach of contract, breach of fiduciary duty, and negligence.[6] Blondell's claims rested on the assertion that Littlepage was obligated to consult and communicate with him on the Corbin matter, and that her failure to do so, and her false representations to the Corbins concerning a possible limitations defense and legal malpractice action, caused him to suffer economic and non-economic damages.

On October 15, 2007, Littlepage moved for summary judgment asserting, among other things, that no actionable duty was owed to Blondell. On October 29, 2007, before the court ruled on the summary judgment motion, Blondell filed an amended complaint adding a count for intentional interference with contractual relations.[7] On November 13, 2007, Littlepage filed a renewed and supplemental motion for summary judgment. On December 19, 2007, the motion was argued, and on December 31, 2007, the circuit court issued an order granting summary judgment in favor of Littlepage on all counts.

As to the fraud/deceit, breach of fiduciary duty, and negligence counts, the circuit court noted that no reported Maryland decision had addressed whether a legally cognizable duty existed between co-counsel on these facts, but the court cited a number of decisions from other jurisdictions to support its conclusion that no such duty existed. Regarding the breach of contract claim, the court found that nothing in the fee sharing agreement required Littlepage to consult with Blondell, and that neither her failure to do so nor any other act constituted a breach of that agreement. Finally, the court observed that a tortious interference with contractual relations claim requires that the interference come from a third party, and because Littlepage was a party to the representation agree-

---

**6.** In the fraud count, appellant requested $1,000,000 compensatory damages and $2,000,000 punitive damages. In the breach of contract count, appellant requested $117, 898.67 compensatory damages, the difference between the amount of his fee as received and the amount it should have been, under his evaluation of the Corbins' claim. In each of the remaining counts, appellant requested $500,000 compensatory damages.

**7.** Appellant requested $500,000 compensatory damages.

ment with the Corbins, she could not have interfered with that agreement.

On January 8, 2008, Blondell moved to alter or amend the judgment, arguing that the court had erroneously character-ized the complaint as one for a fee larger than that which he received. According to Blondell, the fee he would have re-ceived from a larger settlement was merely a measure of damages, "but the nature of the action and the claims ad-vanced involved larger questions." On February 14, 2008, the court denied Blondell's motion. This appeal followed.

## Standard of Review

Summary judgment is proper when there is "no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Maryland Rule 2–501(a). We review the grant of summary judgment *de novo*. *Zitterbart v. Am. Suzuki Motor Corp.*, 182 Md.App. 495, 501, 958 A.2d 372 (2008) (citing *Crickenberger v. Hyundai Motor Am.*, 404 Md. 37, 45, 944 A.2d 1136 (2008)). If no material facts are disputed, we must determine whether the circuit court correctly granted summary judgment as a matter of law. *Ross v. State Bd. of Elections*, 387 Md. 649, 659, 876 A.2d 692 (2005). In doing so, we consider the facts in the light most favorable to the party against whom judgment was granted. *Green v. H & R Block*, 355 Md. 488, 502, 735 A.2d 1039 (1999). Appellate review of an order granting summary judgment is ordinarily limited to "the grounds upon which the trial court relied in granting summary judgment."[8] *Standard Fire Ins. Co. v. Berrett*, 395 Md. 439, 451, 910 A.2d 1072 (2006); *Ross v. State Bd. of Elections*, 387 Md. 649, 659, 876 A.2d 692 (2005).

---

8. In addition to contending that the circuit court was correct for the reasons stated, Littlepage also contends summary judgment was proper because Blondell could not prove legally cognizable damages. Accord-ing to Blondell, his compensatory damages included a reduced fee, damage to his reputation, an economic effect on his law practice, fees and costs incurred and which may be incurred, and mental distress. We decline to reach the parties' arguments regarding damages.

## Discussion

### I. *Claims premised on the recognition of an actionable duty between co-counsel*

With the exception of the tortious interference with contractual relations claim and the breach of contract claim addressed later in this opinion, this appeal centers on the question of whether Littlepage owed a tort duty to her co-counsel, Blondell, in the conduct of their joint representation of the Corbins. Blondell's argument, in general terms, is that Littlepage in her capacity as co-counsel owed him an actionable "duty of fair conduct ... as it exists between business partners or contracting parties." Mr. Blondell argues that this duty is derived from their contractual relationship via the fee sharing agreement; Littlepage's "clear and plain responsibility ... governed by the Rules of Professional Conduct and by other duties"; and her "ultimate duty ... as an officer of the court."

Littlepage argues that, regardless of how characterized, Blondell's claims are for a higher fee, that her "paramount and undivided duty of loyalty" was to the Corbins, and that any duty to Blondell as referring or co-counsel "would create an impermissible conflict" with this paramount duty. Littlepage argues that the fee sharing agreement's only purpose was to obtain the client's written consent to the division of fees, as required by Rule 1.5(e) of the Maryland Lawyers' Rules of Professional Conduct (RPC), and thus it did not impose a duty on her to consult or communicate with Blondell. Littlepage notes that no reported Maryland case has answered the question of whether a legally cognizable tort duty exists between co-counsel, but she points to a number of cases from other jurisdictions refusing to recognize such a duty, and asserts that this position is consistent with Maryland's requirement of strict privity or its equivalent in attorney malpractice cases.

Blondell distinguishes the cases relied on by Littlepage and the circuit court by arguing that those cases only addressed whether an attorney has a duty to protect cocounsel's interest in a prospective contingency fee. Blondell argues that his

claims are not based on the allegation that Littlepage obtained an inadequate settlement "per se." Rather, Blondell asserts that Littlepage violated her duty to him by "deliberately misle[ading] the Corbins into settling by telling them limitations remained a serious concern"; "telling them that they had been victims of malpractice by [Blondell]"; and "suggesting to them that they *sue* Blondell for malpractice." (Emphasis in original). According to Blondell, "[t]hese statements were patently false, were made by Littlepage about her own co-counsel, and were made without consulting him." [9]

We shall consider Blondell's arguments in greater detail below, but our application of tort principles to the present facts leads us to conclude that Littlepage owed no actionable duty to Blondell in her capacity as co-counsel.

### A. *Negligence and fraudulent concealment*

The essential elements of both negligence and fraudulent concealment [10] include the existence of a duty owed to the plaintiff by the defendant.[11] William L. Prosser, *The Law*

---

9. Blondell further explains the nature of his complaint in his reply brief:

> Blondell is not merely airing a complaint that Littlepage could have plausibly held out for a higher settlement offer, and that Blondell should be entitled to compensatory damages for the difference. In addition to negligence with respect to the handling of the case itself, the record shows that what occurred here were affirmative acts by Littlepage to disparage Blondell, to sabotage his representation of the Corbins, and to subject him to economic and other harm—including harm to his reputation and business good-will, and causing him emotional injury.

10. Blondell labels his fraud count as "fraud or deceit," but his complaint pleads facts constituting a claim of fraudulent concealment.

11. The required elements of a negligence claim are "(1) *that the defendant was under a duty to protect the plaintiff from injury,* (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." *Lloyd v. GMC*, 397 Md. 108, 131–32, 916 A.2d 257 (2007) (citations omitted) (emphasis added).

A claim for fraudulent concealment requires that "(1) *the defendant owed a duty to the plaintiff to disclose a material fact;* (2) the defendant

*of Torts* § 53 (4th ed.1971) explains the source and nature of the duty requirement:

> We owe [the duty requirement] to three English cases, decided between 1837 and 1842. The rule which developed out of them was that no action could be founded upon the breach of a duty owed only to some person other than the plaintiff. He must bring himself within the scope of a definite legal obligation, so that it might be regarded as personal to him. 'Negligence in the air, so to speak, will not do.'
>
> * * *
>
> The statement that there is or is not a duty begs the essential question—whether the plaintiff's interests are entitled to legal protection against the defendant's conduct. It is therefore not surprising to find that the problem of duty is as broad as the whole law of negligence, and that no universal test for it ever has been formulated. It is a shorthand statement of a conclusion, rather than an aid to analysis in itself. Yet it is embedded far too firmly in our law to be discarded, and no satisfactory substitute for it, by which the defendant's responsibility may be limited, has been devised. But it should be recognized that "duty" is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection.

(footnotes omitted).

In *Jacques v. First National Bank,* 307 Md. 527, 515 A.2d 756 (1986), the Court of Appeals examined the concept of tort duty at length, writing:

> The duty with which we are here concerned is a duty imposed by law as a matter of sound policy, for the violation

---

failed to disclose that fact; (3) the defendant intended to defraud or deceive the plaintiff; (4) the plaintiff took action in justifiable reliance on the concealment; and (5) the plaintiff suffered damages as a result of the defendant's concealment." *Id.* at 138, 916 A.2d 257 (emphasis added).

of which a person may be held to respond in damages in tort. This duty is conveniently, if not lyrically, referred to as a "tort duty." A tort duty does not always coexist with a moral duty. Neither must a duty imposed by statute necessarily create a tort duty. Nor does a duty assumed or implied in contract by that fact alone become a tort duty.

The mere negligent breach of a contract, absent a duty or obligation imposed by law independent of that arising out of the contract itself, is not enough to sustain an action sounding in tort.

Still, while every contractual duty does not also impose a tort duty, where a contractual relationship exists between persons and at the same time a duty is imposed by or arises out of the circumstances surrounding or attending the transaction, the breach of such duty is a tort and the injured party may have his remedy by an action on the case, or he may waive the tort and sue for the breach of the contract.

In determining whether a tort duty should be recognized in a particular context, two major considerations are: the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties. Where the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability. This intimate nexus is satisfied by contractual privity or its equivalent. By contrast, where the risk created is one of personal injury, no such direct relationship need be shown, and the principal determinant of duty becomes foreseeability.

307 Md. at 533–35, 515 A.2d 756 (citations, quotation marks and footnotes omitted).

■■■■ In sum, the recognition of an actionable tort duty between parties is ultimately a policy decision made by analyzing the nature of the relationship and the alleged harm.[12]

---

**12.** In almost all situations, some type of duty is owed. The question is whether the duty is relevant, based on the facts and the causes of action

Maryland has generally required strict privity in attorney malpractice actions. *See generally Flaherty v. Weinberg,* 303 Md. 116, 127–31, 492 A.2d 618 (1985). This test requires a malpractice plaintiff to prove "(1) the attorney's employment; (2) his neglect of a reasonable duty; and (3) loss to the client proximately caused by that neglect of duty." *Id.* at 128, 492 A.2d 618 (citing *Kendall v. Rogers,* 181 Md. 606, 613, 31 A.2d 312 (1943)). Under this standard, a non-client third party, who may have some other type of contractual relationship with the attorney, ordinarily is unable to maintain a malpractice action as a matter of law because the attorney's professional obligations are only to the client.

In *Flaherty,* the Court recognized a limited exception to the strict privity requirement based on a third party beneficiary theory. *Id.* at 129, 492 A.2d 618. The Court framed the test for recovery under this theory as "whether the intent to benefit [the third party] actually existed, not whether there could have been an intent to benefit the third party." *Id.* at 131, 492 A.2d 618. "Thus," the Court stated, "to establish a duty owed by the attorney to the nonclient the latter must allege and prove that the intent of the client to benefit the nonclient was a direct purpose of the transaction or relationship." *Id.* at 130–31, 492 A.2d 618.

Despite this apparent loosening of the strict privity standard, the Court refused to apply the exception in later cases. *Noble v. Bruce,* 349 Md. 730, 733, 709 A.2d 1264 (1998),

---

alleged. The fact that Blondell and Littlepage are lawyers and were co-counsel does not mean that each does not owe the other that duty which would exist even if they were not lawyers and co-counsel. For example, if Littlepage, while driving, had negligently struck Blondell, a pedestrian, or had intentionally assaulted Blondell, we would not find an absence of duty. If a court concludes that a plaintiff is not entitled to protection in a given context, that court may articulate its conclusion in terms of *no duty,* when it impliedly means no duty in that context. We have sometimes herein referred to that conclusion as *no actionable duty.* It is also worth repeating, as has been noted often in treatises, that when a court concludes, as a matter of public policy, that a plaintiff should not recover, the court may articulate its conclusion as the absence of a duty, as no breach of duty, or as the lack of proximate causation.

rejected a third party beneficiary argument in consolidated cases involving malpractice actions by testamentary beneficiaries for negligent estate planning and negligent drafting of the testator's will, respectively. *Id.* at 733, 709 A.2d 1264. The *Noble* Court instead decided to adhere to the rule of strict privity and hold that the suits were barred as a matter law. *Id.* at 759, 709 A.2d 1264. In doing so, the Court cited a number of public policy considerations for applying the strict privity rule in the will drafting and estate planning context:

First, the rule protects the attorney's duty of loyalty to and effective advocacy for his or her client. While the testator/client is alive, the lawyer owes him or her a "duty of complete and undivided loyalty." The strict privity rule protects an attorney's obligation to direct his or her full attention to the needs of the client. An attorney's preoccupation or concern with potential negligence claims by third parties might result in a diminution in the quality of the legal services received by the client as the attorney might weigh the client's interests against the attorney's fear of liability to a third party. Second, there exists the danger of placing conflicting duties on an attorney during the estate planning process if a nonclient is permitted to maintain a cause of action against a testator's attorney. As a result, an attorney's loyalty might become divided between the testator/client and the beneficiaries. Third, courts fear that absent the strict privity rule there would be no limit as to whom a lawyer would be obligated.... Furthermore, parties to a contract for legal services would lose control of their agreement if liability without privity were permitted. As one commentator noted, the strict privity rule has been retained in some jurisdictions because

"not only should an attorney know in advance who is being represented and for what purpose, but also the attorney should be able to control the scope of the representation and the risks to be accepted. Imposing liability in favor of nonclients, generally speaking, threatens those interests. In threatening the interests of the attorney, the interests of potential clients may also be

> compromised; they might not be able to obtain legal services as easily in situations where potential third party liability exists. Before abandoning privity, the courts need a good reason for thinking that the private arrangements are inadequate."

*Id.* at 741–42, 709 A.2d 1264 (quoting John H. Bauman, *A Sense of Duty: Regulation of Lawyer Responsibility to Third Parties by the Tort System*, 37 S. Tex. L.Rev. 995, 1005–06 (1996)) (internal citations omitted).

*Ferguson v. Cramer,* 349 Md. 760, 709 A.2d 1279 (1998), similarly considered "whether a beneficiary under a will may maintain a cause of action for professional malpractice against an attorney retained by the personal representative of the testator's estate." Citing the same public policy considerations listed in *Noble,* the Court once again held that the strict privity rule applied and the suit by the beneficiary was barred as a matter of law. *Id.* at 776, 709 A.2d 1279. While discussing the need to protect the attorney-client relationship, the Court noted that the suit was not unacceptable due to an actual conflict of interest between the beneficiary and personal representative, but rather due to the potential conflict of interest:

> While the fiduciary in the performance of this service may be exposed to the potential of malpractice . . . , the attorney by definition represents only one party: the fiduciary. It would be very dangerous to conclude that the attorney, through performance of his service to the administrator and by way of communication to estate beneficiaries, subjects himself to claims of negligence from the beneficiaries. The beneficiaries are entitled to even-handed and fair administration by the fiduciary. They are not owed a duty directly by the fiduciary's attorney.

*Id.* at 774, 709 A.2d 1279 (quoting *Goldberg v. Frye,* 217 Cal.App.3d 1258, 266 Cal.Rptr. 483, 489–90 (1990)).

Blondell does not style his suit as an attorney malpractice action, and indeed he could not, because he was not a client of Littlepage. Rather, Blondell bases his claims on the co-

counsel relationship and the fee sharing agreement. Nonetheless, the policy considerations underlying the strict privity requirement apply with equal force here. Blondell's theory elevates the co-counsel relationship to a special status, allowing associated attorneys to sue one another, seeking an affirmative recovery, as distinguished from contribution or indemnification when sued as alleged joint tortfeasors, on the basis of allegedly erroneous or improper legal advice given to the client. The resulting expansion of potential tort claims by non-clients, and the accompanying potential effect on an attorney's duty of loyalty to the client, is precisely the problem the strict privity rule seeks to avoid.

In arguing for the existence of a tort duty, Blondell cites the declaration in Restatement (Third) of Law Governing Lawyers § 56 that lawyers are "subject to liability to a client or nonclient when a nonlawyer would be in similar circumstances." The duty he proposes, however, would apply only to lawyers because it is premised on the co-counsel relationship. Section 56 merely recognizes the obvious, *i.e.*, being a lawyer does not provide blanket protection from liability when liability would otherwise exist. *See supra* note 12. Moreover, Blondell's proposed duty would constitute a new exception to the strict privity requirement by making lawyers liable for malpractice to a special third-party class. Thus, refusing to recognize the novel tort duty between co-counsel proposed by Blondell is not at all inconsistent with the proposition that a lawyer should share the same tort liability as a nonlawyer would under similar circumstances.

Blondell also selectively quotes Restatement (Third) Law Governing Lawyers § 51 to illustrate circumstances in which co-counsel owe one another a tort duty. The cited provisions state in their entirety that a lawyer owes a duty of care:

(2) to a nonclient when and to the extent that:

(a) the lawyer or (with the lawyer's acquiescence) the lawyer's client invites the nonclient to rely on the lawyer's opinion or provision of other legal services, and the nonclient so relies; and

(b) the nonclient is not, under applicable tort law, too remote from the lawyer to be entitled to protection;

(3) to a nonclient when and to the extent that:

(a) the lawyer knows that a client intends as one of the primary objectives of the representation that the lawyer's services benefit the nonclient;

(b) such a duty would not significantly impair the lawyer's performance of obligations to the client; and

(c) the absence of such a duty would make enforcement of those obligations to the client unlikely[.]

If we construe these provisions to apply to the co-counsel relationship, which is clearly not their intent, and assuming the questionable proposition that the provisions in their entirety are consistent with Maryland law, the existence of a tort duty on the facts before us does not follow. First, an attorney does not "invite[ ] [co-counsel] to rely on [his or her] opinion or provision of other legal services." Instead, it is the client who relies on the services collectively provided by co-counsel, with each attorney independently responsible for providing competent and diligent representation. Second, the client certainly does not "intend[ ] as one of the primary objectives of the representation" that the lawyer's services benefit co-counsel.[13] Finally, even if we make the assumption, which we reject, that imposing a tort duty between co-counsel with respect to legal advice given to the joint client "would not significantly impair the lawyer's performance of obligations to client," those obligations are likely to be enforced without such a duty through malpractice actions by clients.

The mere existence of a contract, in this context a fee sharing agreement, is also not enough to create a tort duty. *Jacques*, 307 Md. 527, 534, 515 A.2d 756 ("[A] duty assumed or implied in contract by that fact alone [does not] become a tort duty."). In fact, the fee sharing agreement here directly

---

**13.** This point also demonstrates why the third party beneficiary exception to the strict privity requirement, if it exists under Maryland law, is inapplicable here.

contradicts Blondell's position that Littlepage owed him a duty of consultation and communication, stating that Blondell would provide services "as requested" by Littlepage. Though Blondell technically remained co-counsel, and had some minimal involvement in the case, these circumstances are not enough to elevate his relationship with Littlepage to special status.

Likewise, the Rules of Professional Conduct and an attorney's duty as an officer of the court, cited by Blondell, are not viable sources for the recognition of an actionable tort duty between co-counsel. As the preamble to the RPC states:

> Violation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached. The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability.

*See also Atty. Griev. Comm'n v. Stein,* 373 Md. 531, 544, 819 A.2d 372 (2003).

While Blondell's effort to "rectify [what he perceives as] a case of fraud and dishonesty by a member of the bar," may be laudable, the proper course of action in such cases is to file a complaint in accordance with the law governing disciplinary proceedings.[14]

The cases cited by Blondell, in which courts have allowed an attorney to recover from co-counsel for misconduct during their joint representation, do not recognize the type of tort duty envisioned here. *Kramer v. Nowak,* 908 F.Supp. 1281 (D.Pa.1995), and *Musser v. Provencher,* 28 Cal.4th 274, 121 Cal.Rptr.2d 373, 48 P.3d 408 (2002) involved, respectively, contribution and indemnification actions by attorneys found liable to a joint client for the negligent actions of their associated attorney. This case does not involve either an indemnification or contribution action by one tortfeasor

---

**14.** We do not intimate that Littlepage engaged in fraudulent or dishonest actions. We merely accept Blondell's allegations for purposes of determining whether an actionable duty existed.

against another; thus, we fail to see the import of these cases here. Though *Kramer* additionally recognized that, under certain circumstances, an attorney-employee may owe a tort duty to the employee's attorney-employer under general agency principles, 908 F.Supp. at 1292, that is not the situation before us. Littlepage was not an employee of Blondell.

In *Cavicchi v. Koski*, 67 Mass.App.Ct. 654, 855 N.E.2d 1137 (2006), attorney John Cavicchi succeeded in having his client's criminal conviction vacated. He and William Koski then entered a contingent fee agreement to jointly represent the client in a civil matter, alleging wrongful incarceration. *Id.* at 1140. The client later discharged Cavicchi and refused to pay him for services rendered in the prior criminal proceeding. *Id.* at 1140–41. Cavicchi responded by suing Koski for interference with a contractual or business relationship and violation of a state statute, based on defamatory statements about Cavicchi. Cavicchi alleged that Koski induced the client to fire Cavicchi in the civil matter and to withhold payment of Cavicchi's fee in the criminal case. *Id.* at 1141.

The court recognized that Cavicchi stated a cause of action in tort to a limited extent. It recognized a cause of action based on Koski's alleged interference by improper means with Cavicchi's right to be paid a fee based on his representation of the client in the prior criminal case, a matter in which Koski was not involved. *Id.* at 1144. It also recognized a cause of action, based on the client's discharge of Cavicchi in the civil case, for interfering by improper means, *i.e.*, by uttering defamatory statements, with a business relationship, as distinguished from a contractual relationship. *Id.* at 1142–1143. The court distinguished between improper means, referring to the alleged defamatory statements, and improper motive, explaining that the alleged improper motive by Koski, to further his own economic interest, did not give rise to a cause of action because it was precluded by public policy. *Id.* at 1142. The court did not recognize a cause of action for interference with contract, based on the client's discharge of Cavicchi in the civil case, explaining that, under Massachusetts law, a contingent fee agreement cannot prohibit a client from exercising its

right to discharge its attorney, with or without cause. *Id.* at 1144. Finally, the court did not recognize a statutory cause of action because the attorneys were engaged in the same "enterprise." *Id.* at 1145.

First, we need not address whether and under what circumstances a duty may exist between co-counsel with respect to non-interference with a client relationship because we dispose of the intentional interference with contract count on other grounds, the same ground as relied on by the circuit court. Second, the *Cavicchi* court did not recognize a cause of action for intentional interference with contract except for interference with the payment of a fee already earned by a completed representation in the criminal matter. That is not the situation before us. Third, to the extent the court recognized a cause of action for interference with a business relationship in connection with the civil litigation, the court based it on the alleged defamatory statements which induced the client to discharge the plaintiff. There is no indication that those statements were part of any advice given to the client with respect to the merits of the client's claim. Again, that is not the situation before us. In this case, Blondell and Littlepage disagree with respect to the merits of the limitations defense that was raised in the medical malpractice action.

*Krebs v. Mull,* 727 So.2d 564 (La.Ct.App.1998), *overruled in part by Scheffler v. Adams & Reese, LLP,* 950 So.2d 641, 653 (La.2007), also involved a tortious interference with contractual relations claim between co-counsel where the plaintiff attorney alleged that co-counsel excluded him from participating in their cases, withheld information from him, and induced their joint clients to discharge him. *Id.* at 565–67. Relying on partnership/joint venture principles, the court concluded that the defendant attorney had a fiduciary duty not to interfere with the plaintiff attorney's contracts with the joint clients and therefore allowed the claim to proceed. In *Krebs,* unlike the case before us, the recognition of a joint venture and accompanying fiduciary duty was premised on an agreement by the parties to participate equally in preparing and trying the cases. Most significant, however, is that in *Scheffler,* the

Supreme Court of Louisiana overruled the holding in *Krebs* that a fiduciary duty existed on the ground that "no cause of action will exist between co-counsel based on the theory that co-counsel have a fiduciary duty to protect one another's prospective interests in a fee." *Scheffler*, 950 So.2d at 653.

Blondell attempts to distinguish *Scheffler* and other similar cases by emphasizing that he is seeking to uphold higher principles of professional responsibility rather than protect an interest in a prospective fee. Assuming Blondell is driven by loftier motives, we nonetheless find the policy considerations raised in those cases applicable here. As the California Supreme Court explained in *Beck v. Wecht*, 28 Cal.4th 289, 121 Cal.Rptr.2d 384, 48 P.3d 417 (2002):

> If the law were to recognize duties, such as are suggested here, between successive attorneys representing the same client, a multitude of litigation could be spawned with an attendant adverse impact 'on attorney-client relationships. Every lawyer could blame his problems in a lawsuit on his predecessors. Every lawyer referring a case to another lawyer would be in a position to claim that the negligence of the second lawyer caused a meritorious claim to be lost or settled for an insufficient amount. Public confidence in the legal system may be eroded by the spectacle of lawyers squabbling over the could-have-beens of a concluded lawsuit, even when the client has indicated no dissatisfaction with the outcome. Considerations of public policy support the conclusion that an attorney's duty of undivided loyalty to his client should not be diluted by imposing upon him obligations to the client's former attorney, or at least obligations greater than the client himself owed to the former attorney.

*Id.* 121 Cal.Rptr.2d 384, 48 P.3d at 421 (quoting *Mason v. Levy & Van Bourg*, 77 Cal.App.3d 60, 143 Cal.Rptr. 389, 392 (1978)); *see also Scheffler*, 950 So.2d at 649–53 (citing *Beck* and declining to impose a fiduciary obligation on attorneys to account for the interests of co-counsel in recovering a prospective fee); *Charles Gruenspan Co. v. Thompson*, 2003 Ohio 3641, P28–29 (2003) (following *Beck* and refusing to recognize

a fiduciary duty between co-counsel); *Mazon v. Krafchick*, 158 Wash.2d 440, 144 P.3d 1168, 1172 (2006) (following *Beck* and adopting "a bright-line rule that no duties exist between cocounsel that would allow recovery for lost or reduced prospective fees"); *Horn v. Wooster*, 165 P.3d 69, 79 (Wyo.2007) (following *Beck* in answering "no" to certified question "[c]an the Associated Attorney recover the agreed portion of the contingent fee, either as an offset against the contingent fee or as a separate claim against the Principal Attorney?").

Blondell maintains that there was no conflict of interest, asserting that "Littlepage was not faced with any Hobson's choice of duty to Blondell, versus duty to the clients." Regardless of the validity of this assertion, our concern extends beyond the narrow purview of this case to potential conflicts that may arise under different circumstances. In fact, it was the concern with potential conflicts of interest that prompted the Court of Appeals to adhere to a strict privity requirement in *Noble* and *Ferguson*. Echoing the sentiment of the California Supreme Court in *Beck*, the *Noble* Court explained how expanding attorney liability to third parties might affect the quality of representation: "An attorney's preoccupation or concern with potential negligence claims by third parties might result in a diminution in the quality of the legal services received by the client as the attorney might weigh the client's interests against the attorney's fear of liability to a third party." *Noble*, 349 Md. at 741, 709 A.2d 1264. Recognizing the duty urged by Blondell would create this potential conflict.

We refuse to allow Blondell to essentially step into the shoes of the Corbins and assert claims based on allegations that amount to a breach of Littlepage's duty to the clients rather than to co-counsel. Thus, we agree with the circuit court that Littlepage owed no actionable tort duty to Blondell under these circumstances.

B. *Breach of Contract*

Blondell also seeks to recover from Littlepage for breach of contract by positing two theories. First, Blondell argues that the fee sharing agreement gave rise to a duty of good faith

and fair dealing implicit in all contracts. Second, Blondell argues that the agreement created a joint venture between himself and Littlepage, which included the fiduciary duties that accompany this relationship. As with his tort claims, Blondell asserts that Littlepage violated these duties by failing to discuss the settlement negotiations with him, by improperly advising the Corbins with respect to the limitations issue, and by surreptitiously advising the Corbins that they could pursue a malpractice claim against him.

### 1. Implied duty of good faith and fair dealing

Indeed, a contract in Maryland gives rise to an implied duty of good faith and fair dealing, *see Clancy v. King*, 405 Md. 541, 565–66, 954 A.2d 1092 (2008) (and cases cited therein); however, that duty was not violated here. The fee sharing agreement obligated Littlepage to share with Blondell any legal fee she earned "on the basis of the anticipated division of services to be rendered in the case." [15] There is no dispute that Littlepage delivered to Blondell his proportionate share of the settlement, thus fulfilling her obligation to Blondell under the agreement.[16]

Blondell's assertion that implied contractual duties include a duty to consult and communicate does not reference any supporting legal authority, nor are we aware of any. More important, the actual terms of the agreement gave Littlepage authority to conduct the matter without consulting Blondell, providing that "[Littlepage] *will have primary responsibility for the prosecuting my/our claim* [sic], including handling court appearances and the trial of the case, should such become necessary, and that, [Blondell] will act as co-counsel in the case and will perform other services *as requested* by [Littlepage]." (Emphasis added).

---

**15.** As previously noted, there was undisputed testimony that Blondell and Littlepage orally agreed to divide the fee 50–50.

**16.** Blondell alleges that Littlepage delayed in remitting his share of the fee, but this allegation is not the basis of his claim that Littlepage breached her contractual duties; thus, we shall not address it.

 Under the objective test of contract interpretation applied in Maryland, "the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract." *Sy–Lene of Wash., Inc. v. Starwood Urban Retail II,* 376 Md. 157, 167, 829 A.2d 540 (2003). When the contract language is unambiguous, we "give effect to its plain, ordinary, and usual meaning, taking into account the context in which it is used." *Id.* There is nothing in the plain language of the fee sharing agreement obligating Littlepage to consult and communicate with Blondell. On the contrary, Blondell was only to assist in the representation of the Corbins "as requested" by Littlepage.

The parol evidence is consistent with the plain language. The evidence confirms that Littlepage essentially had sole responsibility for handling the Corbin matter, and Blondell's participation was minimal. *See id.* at 167–68, 829 A.2d 540 ("If the contract is ambiguous, the court must consider any extrinsic evidence which sheds light on the intentions of the parties at the time of the execution of the contract.").

2. Fiduciary duty under joint venture/partnership principles

 An analysis of the agreement under joint venture/partnership principles also fails to provide Blondell with a cause of action against Littlepage. The duties of partners/joint venturers are defined by the Maryland Revised Uniform Partnership Act, Maryland Code (2007 Repl.Vol.), § 9A–404 of the Corporations and Associations Article (C & A):

(a) Two fiduciary duties only.—The only fiduciary duties a partner owes to the partnership and the other partners are the duty of loyalty and the duty of care set forth in subsections (b) and (c) of this section.

(b) Duty of loyalty.—A partner's duty of loyalty to the partnership and the other partners is limited to the following:

(1) To account to the partnership and hold as trustee for it any property, profit, or benefit derived by the partner in

the conduct and winding up of the partnership business or derived from a use by the partner of partnership property, including the appropriation of a partnership opportunity;

(2) To refrain from dealing with the partnership in the conduct or winding up of the partnership business as or on behalf of a party having an interest adverse to the partnership; and

(3) To refrain from competing with the partnership in the conduct of the partnership business before the dissolution of the partnership.

(c) Duty of care.—A partner's duty of care to the partnership and the other partners in the conduct and winding up of the partnership business is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

(d) Obligation of good faith.—A partner shall discharge the duties to the partnership and the other partners under this title or under the partnership agreement and exercise any rights consistently with the obligation of good faith and fair dealing.

See also *Wildwood Med. Ctr., L.L.C. v. Montgomery County*, 405 Md. 489, 498–99, 954 A.2d 457 (2008) (Stating that the association of " 'two or more persons who carry on as co-owners' in a mutually beneficial business relationship ... creates a partnership 'whether or not [it] is called partnership, joint venture, or any other name.' " (quoting C & A §§ 9A-101(i) and 9A-202(a)) (second alteration in original)).

Again, Blondell has not cited, nor have we located, any Maryland law for the proposition that a fee sharing agreement similar to the one in this case creates a joint venture. The "partnership agreement"—in this case, the fee sharing agreement—set out the obligations of the parties: Littlepage was primarily responsible for handling the Corbin matter, Blondell would provide assistance as requested by Littlepage and share in any fee she recovered. *See* C & A § 9A-103 (providing that "relations among the partners and between the partners and the partnership are governed by the partnership agreement"

and allowing, within certain limits, modification of the duties partners owe to one another). As we explained above, Littlepage met her obligation under the agreement when she paid Blondell his portion of the fee. Nothing in the agreement required Littlepage to consult and communicate with Blondell.

Furthermore, many of the cases cited by Blondell from other jurisdictions premise the recognition of a joint venture between attorneys on the existence of equal responsibility and authority over the conduct of the joint representation. *See Romanek v. Connelly*, 324 Ill.App.3d 393, 257 Ill.Dec. 436, 753 N.E.2d 1062, 1072 (2001) ("The existence of a joint venture is shown by allegations demonstrating (1) a community of interest in the purpose of the joint association, (2) a right of each member to direct and govern the policy and conduct of the other members, and (3) a right to joint control and management of the property used in the enterprise."); *Krebs*, 727 So.2d at 568 (recognizing a joint venture where attorneys agreed to exert "joint efforts in the preparation and trial of the cases"); *Duggins v. Guardianship of Washington*, 632 So.2d 420, 427 (Miss.1993) (recognizing a joint venture where attorneys agreed to joint control); *Lapkin v. Garland Bloodworth, Inc.*, 23 P.3d 958, 963 (Okl.Civ.App.2000) ("Where the relationship between attorneys 'is one of more nearly equal responsibility, authority, and profit sharing, it may fit the legal description of a joint venture ... permitting joint and several liability.' " (citation omitted)).

The Appellate Court of Illinois made this same distinction in *Canel & Hale, Ltd. v. Tobin*, 304 Ill.App.3d 906, 238 Ill.Dec. 64, 710 N.E.2d 861 (1999), where it refused to recognize a joint venture or fiduciary duty between attorneys under circumstances similar to this case. *Id.* 238 Ill.Dec. 64, 710 N.E.2d at 871. In *Tobin*, like this case, the attorneys entered into a fee sharing agreement mandated by state professional rules, where "the primary service performed by the referring lawyer [was] the referral of the client to the other lawyer." *Id.* As the court described the arrangement:

[P]laintiff was to be 'primarily responsible for the preparation and resolution of the [clients'] claim, plaintiff would

from time to time require assistance from [defendant]....'
The form further provided that plaintiff and defendant ...
"are both responsible to see that [the clients'] claim is
properly handled." Furthermore, the disclosure form indi-
cated that defendant ... was to receive a portion of plain-
tiff's fee.

(third alteration in original).

The court concluded that the agreement, and the actual
division of labor and responsibility, did not give rise to a joint
venture or fiduciary duties between the parties:

Plaintiff was to do a disproportionate amount of work.
Plaintiff and defendant ... were not acting as co-counsel for
the [clients]; plaintiff had a disproportionate amount of
control over the handling of the case. The parties engaged
in no shared decision-making or shared work for the benefit
of the [the clients]. They did not even share the costs—
only the profit. Therefore, there was no joint venture here
and, thus, no fiduciary duty owed.

Blondell attempts to show joint authority by pointing out
that he remained co-counsel under the fee sharing agreement.
Nonetheless, as in *Tobin,* the fee sharing agreement here gave
primary responsibility to Littlepage, and the undisputed facts
show that Blondell had only a minimal advisory role. Blondell
quotes 46 Am.Jur.2d Joint Ventures § 50 to establish that the
agreement between himself and Littlepage constituted a joint
venture, but as Littlepage notes, the very same section pro-
vides that no joint venture or fiduciary duty exists under
circumstances similar to those here.[17]

 Assuming joint venture or partnership principles ap-
ply, fiduciary duties arising from a fee sharing agreement are
ordinarily limited to accounting for fees and expenses and are
unrelated to providing legal advice to the joint client. As C &
A § 9A–404(b)(1) states, a partner's duty of loyalty includes
"account[ing] to the partnership and hold[ing] as trustee for it

---

17. The passage quoted by Littlepage references *Tobin* as supporting
authority. *See* 46 Am.Jur.2d Joint Ventures § 50.

any property, profit, or benefit derived by the partner in the conduct . . . of the partnership business." Accordingly, several of the cases cited by Blondell center on allegations that one party failed to disburse the agreed upon fee. *See McCann v. Todd,* 203 La. 631, 634, 14 So.2d 469 (La.1943); *Romanek,* 324 Ill.App.3d at 396, 257 Ill.Dec. 436, 753 N.E.2d 1062; *Holstein,* 246 Ill.App.3d at 722, 186 Ill.Dec. 592, 616 N.E.2d 1224.

Other cases cited by Blondell indicate that co-counsel may be jointly and severally liable under partnership principles for the misapplication of client funds. *See Lapkin,* 23 P.3d at 962; *Duggins,* 632 So.2d at 427–28; *see also* CA § 9A–306(a) (providing for joint and several liability between partners). None of the above cases, however, recognizes anything close to the duty Blondell proposes, which would render co-counsel liable to one another based on the content of legal advice given to the client. We see no basis for this theory under general partnership principles or the particulars of the agreement here. Thus, we affirm the circuit court's grant of summary judgment in favor of Littlepage on Blondell's breach of contract claim.

## C. *Breach of fiduciary duty*

Blondell's breach of fiduciary duty claim fails on both procedural and substantive grounds. As the circuit court concluded, Maryland does not recognize a generic cause of action for breach of fiduciary duty. *Kann v. Kann,* 344 Md. 689, 711, 690 A.2d 509 (1997). We have already considered and rejected Blondell's fiduciary duty argument in the context of his other claims, thus, no further discussion is required.

## II. *Intentional Interference with Contractual Relations*

Blondell's final claim against Littlepage is for intentional interference with contractual relations. The elements of the claim are as follows:

"(1) The existence of a contract or a legally protected interest between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional inducement of the third party to breach or

otherwise render impossible the performance of the contract; (4) without justification on the part of the defendant; (5) the subsequent breach by the third party; and (6) damages to the plaintiff resulting therefrom."

*Bagwell v. Peninsula Regional Medical Ctr.,* 106 Md.App. 470, 503, 665 A.2d 297 (1995), *cert. denied,* 341 Md. 172, 669 A.2d 1360 (1996) (quoting *Storch v. Ricker,* 57 Md.App. 683, 703, 471 A.2d 1079 (1984)).

The circuit court noted that "[t]he central element to this tort is that interference must come from a third party" and that in this case both Blondell and Littlepage were parties to the agreement to represent the Corbins. Consequently, the circuit court concluded Littlepage could not have tortiously interfered with a contract to which she was a party.

Indeed, "[a]s a matter of law, a party to a contract cannot tortiously 'interfere' with his or her own contract." *Id.* Blondell argues that, "given the [circuit] court's own assessment of the scenario that an attorney's duty and loyalty is to the client alone, Littlepage is a third party with respect to Blondell's independent attorney-client relationship with the Corbins (and vice versa)." This argument is a non-sequitur. By mutually agreeing to represent the Corbins, Blondell and Littlepage each incurred a duty of undivided loyalty to the Corbins with respect to the joint representation, but the agreement was nonetheless a tripartite agreement.[18] Little-

---

**18.** *Tobin,* discussed *supra,* concluded that the fee sharing agreement did not create a contract between the attorneys. 238 Ill.Dec. 64, 710 N.E.2d at 869. That assessment does not apply in this case for several reasons. First, the court in *Tobin* noted that the document did not bind the referring attorney to do anything, and the agreement did not meet the basic requisites for a contract. *Id.* Contrarily, the agreement here bound Blondell to provide assistance at Littlepage's request and, as supplemented orally, it provided for a specific fee sharing.

Second, the *Tobin* Court maintained that treating the agreement as a contract between the three signatories (plaintiff law firm, defendant attorney, and clients) would interfere with a client's right to discharge their attorney by forcing them to breach the contract in order to exercise that right. *Id.* 238 Ill.Dec. 64, 710 N.E.2d at 870. Under Maryland law, the relationship between a client and an attorney is

page agreed to undertake primary responsibility for the representation and to divide equally with Blondell any fee recovered. Blondell, in exchange, agreed to remain as co-counsel and provide services as requested. Thus, we agree with the circuit court and conclude that Littlepage was not a third party to the contract between Blondell and the Corbins.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY IS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

---

contractual in nature, *see Flaherty*, 303 Md. at 134, 492 A.2d 618 (stating that an attorney malpractice action lies in contract), even though the client may discharge an attorney at any time or settle a claim without the attorney's knowledge or consent. *Palmer v Brown*, 184 Md. 309, 316, 40 A.2d 514 (1945). If discharged without cause, however, the attorney may have a *quantum meruit* claim. *Scamardella v. Illiano*, 126 Md.App. 76, 95–96, 727 A.2d 421 (1999).

Finally, in this case neither party has argued that there was no contract. Blondell's entire theory of recovery is based on the existence of a contractual relationship but, in this context, he argues that there was more than one contract.

The *Tobin* Court, while concluding that there was no contract, ultimately concluded that the plaintiff stated a cause of action for intentional interference with prospective economic advantage. 238 Ill.Dec. 64, 710 N.E.2d at 872. As stated, in the case before us, there was a contract, and under Maryland law, a party to a contract cannot intentionally interfere with that contract. In Maryland, the result would be the same if the tort were intentional interference with an economic relationship because the interference must be by a third party, not a party to the relationship. *Bleich v. Florence Crittenton Servs.*, 98 Md.App. 123, 146, 632 A.2d 463 (1993).