991 A.2d 80

William J. BLONDELL, Jr., et al.

v.

Diane M. LITTLEPAGE, et al.

No. 73 Sept.Term, 2009.

Court of Appeals of Maryland.

March 17, 2010.

Jonathan E.C. May, Nathaniel C. Fick (Fick & May, P.C., Towson, MD), on brief, for Petitioners.

R. Scott Krause (Eccleston and Wolf, P.C., Hanover, MD), on brief, for Respondents.

ARGUED BEFORE BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

BATTAGLIA, Judge.

We are asked to consider whether an attorney, William J. Blondell, Petitioner, may maintain various contract and tort claims involving various alleged breaches of duties of good faith, fair dealing, and disclosure against another lawyer, Diane M. Littlepage,[1] Respondent, regarding representation of a husband and wife as plaintiffs in a medical malpractice action.

The three questions presented, which we have renumbered, are:

I. Whether one attorney, in a joint representation of a client with co-counsel, owes co-counsel contractual duties of good faith and fair dealing with respect to the course of the representation, the breach of which support a cause of action?

II. Whether one attorney, in a joint representation of a client with co-counsel, has an actionable tort duty to disclose to co-counsel material facts and information relating to the representation, when the failure to do so will not only injure the client and negatively impact the representation, but also result in economic and other injury to co-counsel?

III. Whether one attorney, in a joint representation of a client with co-counsel, can ever state a claim against co-

---

**1.** The complaint lists William J. Blondell and William J. Blondell, Chtd. as Plaintiffs and Diane Littlepage and Littlepage and Associates as Defendants. We shall refer to the respective litigants solely as Blondell and Littlepage.

counsel for the tortious interference with the first attorney's economic relationship with the client?

*Blondell v. Littlepage,* 409 Md. 46, 972 A.2d 861 (2009). We shall hold that Littlepage, on the well-pleaded facts, did not breach the express or implied terms of the contract in question; that the fee sharing agreement in issue, as a matter of law, did not give rise to actionable tort duties of consultation, communication, and disclosure between Littlepage and Blondell; and finally, that Littlepage, as a matter of law, could not tortiously interfere with a contractual or economic relationship to which she was a party.

**Background**

We adopt the facts [2] including the procedural history of the case and corresponding numbered notes, set forth in the reported opinion, *Blondell v. Littlepage,* 185 Md.App. 123, 129–33, 968 A.2d 678, 681–83 (2009), of the Court of Special Appeals:

In May 1999, Doctor Amile A. Korangy performed a mammogram on Lois Corbin and reported no abnormalities in the results. Subsequently, in November 1999, Ms. Corbin detected a lump in her left breast. Ms. Corbin scheduled the first available appointment with her gynecologist, Doctor Dee Hubbard, who examined Ms. Corbin on January 18, 2000. Dr. Hubbard scheduled Ms. Corbin for another mammogram on January 19, 2000, and a sonogram on January 21, 2000, both of which returned results suspicious for malignancy. A subsequent biopsy confirmed that Ms. Corbin had breast cancer.

In approximately May 2000, the Corbins retained Blondell to pursue a possible claim for medical malpractice against Dr. Korangy, believing that he misread Ms. Corbin's May 1999 mammogram. On January 21, 2003, Blondell filed a

---

**2.** Blondell asserts that Littlepage's "credibility" regarding the bona fides of her settlement advice to the Corbins remains disputed, but that alleged controversy is not relevant to our determination that Blondell does not have a cause of action as a matter of law.

medical malpractice claim against Dr. Korangy in the Health Claims Arbitration Office. The parties elected to waive arbitration, and on April 8, 2003, the Health Claims Arbitration Office transferred the case to the Circuit Court for Baltimore County.

In approximately January 2004, while the case was in early discovery, Blondell referred the Corbins' claim to Littlepage.[2] On January 15, 2004, the Corbins executed a document titled "Acknowledgment and Consent to Fee–Sharing Agreement" that stated:

Pursuant to the applicable Rules of Professional Conduct, I/we, the undersigned, do hereby acknowledge that I/we have been advised by the law firm of Diane M. Littlepage, Esquire that the legal fee in my/our case will be shared between Diane M. Littlepage, Esquire and William Blondell, Esquire on the basis of the anticipated division of services to be rendered in the case. I/we understand that Diane M. Littlepage, Esquire, will have primary responsibility for the prosecuting my/our claim [sic], including handling court appearances and the trial of the case, should such become necessary, and that, William Blondell, Esquire will act as co-counsel in the case and will perform other services as requested by Diane M. Littlepage, Esquire. I/we hereby consent to the sharing of the fee and understand that the fee-sharing agreement will have NO effect on the overall fee to be charged in my/our case.

Blondell and Littlepage acknowledge that, while the writing did not address the specific division of the fee, they orally agreed to divide any contingency fee fifty-fifty. Littlepage entered an appearance on behalf of the Corbins. Though Blondell remained counsel of record, he had no further contact with the Corbins, and aside from a few sporadic discussions with Littlepage, was not asked to and did not actively participate in the case from that point forward.

In March 2005, Dr. Korangy filed a motion for summary judgment, asserting that the claim was barred by the three-year statute of limitations, *see* Maryland Code (2006 Repl.

Vol., 2008 Supp.), § 5–109(a) of the Courts and Judicial Proceedings Article, because Ms. Corbin was on inquiry notice no later than January 18, 2000, and the claim was not filed until January 21, 2003. Littlepage filed an opposition after discussing the matter with Blondell. By order dated May 31, 2005, the circuit court denied Dr. Korangy's motion.

---

[2] Blondell had previously referred medical malpractice matters to Littlepage.

A pre-trial settlement conference was held in August, 2005. In a conversation before the conference, Blondell suggested to Littlepage that he accompany her to the conference because of his familiarity with the settlement judges. Littlepage did not object to Blondell's suggestion, but Blondell ultimately did not attend the conference.[3]

According to Littlepage, the settlement judge advised her during the conference that "Dr. Korangy's limitations argument was compelling and that Dr. Korangy would likely prevail in making such an argument to the trial judge or on appeal." Dr. Korangy also indicated that he would appeal an adverse verdict on the limitations issue. Littlepage discussed the limitations problem in a conversation with Blondell following the settlement conference, but the pair had no further discussions regarding the settlement negotiations.[4]

As the September 12, 2005 trial date approached, Littlepage discussed with the Corbins various factors influencing a potential settlement, including Ms. Corbin's failing health, a scheduling conflict between the trial and Ms. Corbin's daughter's wedding, the cost the Corbins would incur in the event of a defense verdict, and the limitations issue. In addition, Littlepage stated her opinion that Blondell unnecessarily delayed filing their claim, thus creating an arguable limitations defense that diminished the value of their claim. Littlepage recommended that the Corbins consult with

---

[3] Blondell testified that he attempted to reach Littlepage a few days prior to the conference and on the day of the conference, without success.

[4] Littlepage claimed that the settlement judge raised the possibility of a malpractice action against Blondell during the conference, but it is unclear from the record whether she informed Blondell of this fact in their conversation. Littlepage claimed that Blondell was nonetheless aware of a possible malpractice action against him. Blondell did not deny being aware of a potential malpractice claim, but contended that he was never informed of the comment by the settlement judge, nor did he believe the judge would have made such a comment.

counsel regarding a possible malpractice action against Blondell, and provided them with the names of attorneys that regularly handled such claims. The Corbins eventually decided to settle the claim against Dr. Korangy for $225,000, which was significantly less than the $1 million initially demanded by Littlepage, and the $350,000 recommended by the settlement judge.[5] Littlepage remitted one-half of the contingency fee to Blondell.

On December 18, 2006, Blondell filed a complaint against Littlepage, which contained counts alleging fraud/deceit, breach of contract, breach of fiduciary duty, and negligence.[6] Blondell's claims rested on the assertion that Littlepage was obligated to consult and communicate with him on the Corbin matter, and that her failure to do so, and her false representations to the Corbins concerning a possible limitations defense and legal malpractice action, caused him to suffer economic and non-economic damages.

On October 15, 2007 Littlepage moved for summary judgment asserting, among other things, that no actionable duty was owed to Blondell. On October 29, 2007, before the court ruled on the summary judgment motion, Blondell filed an amended complaint adding a count for intentional interference

---

[5] The $1 million and $350,000 figures were provided by Blondell. Littlepage neither confirmed nor denied these amounts.

[6] In the fraud count, appellant requested $1,000,000 compensatory damages and $2,000,000 punitive damages. In the breach of contract count, appellant requested $117,898.67 compensatory damages, the

difference between the amount of his fee as received and the amount it should have been, under his evaluation of the Corbins' claim. In each of the remaining counts, appellant requested $500,000 compensatory damages.

with contractual relations.[7] On November 13, 2007, Littlepage filed a renewed and supplemental motion for summary judgment. On December 19, 2007, the motion was argued, and on December 31, 2007, the circuit court issued an order granting summary judgment in favor of Littlepage on all counts.

As to the fraud/deceit, breach of fiduciary duty, and negligence counts, the circuit court noted that no reported Maryland decision had addressed whether a legally cognizable duty existed between co-counsel on these facts, but the court cited a number of decisions from other jurisdictions to support its conclusion that no such duty existed. Regarding the breach of contract claim, the court found that nothing in the fee sharing agreement required Littlepage to consult with Blondell, and that neither her failure to do so nor any other act constituted a breach of that agreement. Finally, the court observed that a tortious interference with contractual relations claim requires that the interference come from a third party, and because Littlepage was a party to the representation agreement with the Corbins, she could not have interfered with that agreement.

On January 8, 2008, Blondell moved to alter or amend the judgment, arguing that the court had erroneously characterized the complaint as one for a fee larger than that which he received. According to Blondell, the fee he would have received from a larger settlement was merely a measure of damages, "but the nature of the action and the claims advanced involved larger questions." On February 14, 2008, the court denied Blondell's motion.

---

[7] Appellant requested $500,000 compensatory damages.

In fashioning his causes of action, Blondell asserted that Littlepage owed him various duties, contractual and otherwise, pursuant to the fee sharing agreement. In support of his

breach of contract claim, Blondell alleged that Littlepage owed a duty of consultation, as well as to inform Blondell of "significant developments":

54. Plaintiffs Blondell and the Blondell firm had a contractual arrangement with Defendants Littlepage and Littlepage and Associates, through the fee sharing Acknowledgment and Agreement signed by the Corbins and binding on both Littlepage and Blondell, concerning the Corbin matter.

55. Under the Fee Sharing Agreement, the Littlepage Defendants had the contractual responsibility to conduct the litigation as counsel on behalf of the Corbins, and were to keep the Blondell firm informed of significant developments.

56. Under the Fee Sharing Agreement, the Littlepage Defendants had the contractual responsibility to consult with the Blondell firm and to take under consideration advice or recommendations offered by the Blondell firm.

57. Littlepage did not consult with the Blondell firm concerning the Corbin matter, did not accept Blondell firm advice, did not bring the Blondell firm into the settlement negotiations or the settlement conference, and settled the matter for a figure considerably lower than an appropriate settlement sum.

Blondell further posited in his opposition to summary judgment that a "joint endeavor" was created by the representation of the Corbins, with attendant fiduciary duties of honesty and disclosure. In the Court of Special Appeals and in this Court, Blondell asserted that the fee sharing contract imposed implied duties of "good faith and fair dealing" on Littlepage.

In his negligence count, Blondell asserted that Littlepage owed a "legal duty" of consultation and communication regarding the Corbin matter:

71. Plaintiffs Blondell and the Blondell firm had an arrangement with Defendants Littlepage and Littlepage and Associates, through the referral and fee-sharing arrangement concerning the Corbin matter, in which the Littlepage Defendants had primary responsibility in the matter, placing the Defendants in a superior position concerning the

matter with respect to Plaintiffs, but the Blondell Plaintiffs remained in the matter as counsel.

72. The Littlepage defendants therefore had a legal duty to Mr. Blondell and the Blondell firm to exercise care and diligence in the execution of the business of the Corbin matter entrusted to them, as well as duty [sic] of loyalty and good faith communications in all communications, without any self-interest or self-dealing, and due consideration for the economic interests of the Blondell firm.

73. Under that arrangement, Defendants were to conduct the litigation as counsel on behalf of the Corbins and to keep the Blondell firm informed of significant developments.

74. The Littlepage Defendants had a legal duty to consult with the Blondell firm and to take under consideration any advice or recommendations offered by Mr. Blondell and the Blondell firm concerning the matter.

75. The Littlepage Defendants did not consult with Mr. Blondell and the Blondell firm concerning the Corbin matter, did not accept Blondell firm advice, did not bring the Blondell firm into the settlement negotiations or the settlement conference, engaged in mischief and manipulation of the Corbins while not communicating with Plaintiffs, and settled the matter for a figure considerably lower than an appropriate settlement sum.

In support of his claim alleging fraudulent concealment,[3] Blondell asserted that Littlepage owed a duty of disclosure regarding the valuation of the Corbin claim:

41. Littlepage acted intentionally and caused harm to Plaintiffs in undertaking the actions, communications and correspondence, making and using wholly improper and disparaging comments about Mr. Blondell and the Blondell firm and advising the Corbins that they could accept an

---

**3.** The Circuit Court and Court of Special Appeals determined that, although Blondell labeled his count "fraud or deceit," his complaint instead pleaded facts constituting a claim of "fraudulent concealment." *See Blondell v. Littlepage,* 185 Md.App. 123, 135 n. 10, 968 A.2d 678, 685 n. 10 (2009).

inadequate amount and thereafter sue Blondell for an amount that would properly represent the true value of their medical negligence claims.

42. Littlepage acted intentionally and caused harm to Plaintiffs from August forward in deliberately ignoring Blondell's requests for information as to the status of the Corbin claims, while at the same time, unbeknownst to Blondell, making and using wholly improper and disparaging comments about Mr. Blondell and the Blondell firm.

43. Throughout this period of time, Littlepage and Blondell were jointly professionally responsible for the exercise of care and diligence in the execution of the business of the Corbin matter entrusted to them.

44. Such representations to Blondell regarding the status of the Corbin claims throughout September, October, and into the middle of November, while at the same time and without Blondell's knowledge engaging in an enterprise of mischief and manipulative misrepresentation to the Corbins, constituted false representations of material facts.

In developing his intentional interference with contractual relations claim, Blondell alleged that Littlepage improperly "ousted" him from involvement in the settlement negotiations, blocking his participation in the representation:

81. As engaged co-counsel with Blondell in the Corbin's case, Littlepage knew of the existence of the contract between Blondell and the Corbins, whereby he would provide his services as legal counsel for a fee.

82. Littlepage acted intentionally and improperly when she ousted Blondell from any involvement in the settlement negotiations and proceedings in the Corbins' case, blocking his participation and advice.

83. Littlepage purposefully ousted Blondell from settlement negotiations and proceedings, and intentionally blocked his participation and advice as counsel to the Corbins, so that Blondell could not advise the Corbins against the ultimate settlement for an inadequate amount. Little-

page wanted the Corbins to settle their case without the aid, advice, or guidance of Blondell.

84. Littlepage's conduct and ouster made it impossible for Blondell to perform his contracted-for duties as counsel to the Corbins during the settlement negotiations and proceedings. Blondell was unable to advise the Corbins, advise his co-counsel, or otherwise advocate on the Corbins' behalf as a result of Littlepage's conduct. Furthermore, Blondell was unable to resolve, or attempt to resolve, the Corbins' case in a legally satisfactory manner or for a legally satisfactory sum.

Blondell asserted that as a result of Littlepage's breaches of contractual and tort duties, he has suffered palpable injury, separate from merely having received a lesser amount of his share of the fee. He explained in his opposition to summary judgment in the Circuit Court that his claim was "motivated not by the fact that Littlepage settled the Corbin matter for a low sum," but rather because "she advised and allowed settlement for that sum on the basis that the Corbins could sue Blondell for the remaining value of their medical malpractice claim." Before this Court, counsel for Blondell reiterated that this case "is not a fee dispute," and that his injury is "more expansive" than a reduced anticipated fee, describing his injuries as more related to his inability, during Mrs. Corbin's lifetime, "to call her to tell her what really occurred and how sorry [he] was."

**Standard of Review**

The entry of summary judgment is governed by Rule 2–501, which provides in pertinent part:

(f) **Entry of judgment.** The court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law.

As we recently stated in *Gourdine v. Crews,* 405 Md. 722, 735–36, 955 A.2d 769, 777–78 (2008), the standard of review of a grant of such a motion is as follows:

In considering a trial court's grant of a motion for summary judgment, this Court reviews the record in the light most favorable to the non-moving party. *Anderson v. Council of Unit Owners of Gables on Tuckerman Condominium,* 404 Md. 560, 570–71, 948 A.2d 11, 18 (2008); *Rodriguez v. Clarke,* 400 Md. 39, 926 A.2d 736 (2007); *Rhoads v. Sommer,* 401 Md. 131, 148, 931 A.2d 508, 518 (2007) ("We review the record in the light most favorable to the non-moving party and construe any reasonable inferences that may be drawn from the facts against the moving party."); *Harford County v. Saks,* 399 Md. 73, 82, 923 A.2d 1, 6 (2007) (In reviewing a trial court's decision on a motion for summary judgment, "we seek to determine whether any material facts are in dispute and, if they are, we resolve them in favor of the non-moving party."); *Lovelace v. Anderson,* 366 Md. 690, 695, 785 A.2d 726, 728 (2001) (In reviewing a grant of the defendants' motions for summary judgment, "we must review the facts, and all inferences therefrom, in the light most favorable to the plaintiffs."). If no material facts are in dispute, this Court must determine whether the Circuit Court correctly entered summary judgment as a matter of law. *Anderson,* 404 Md. at 571, 948 A.2d at 18; *Rodriguez,* 400 Md. at 70, 926 A.2d at 754; *Saks,* 399 Md. at 82, 923 A.2d at 6; *Property and Casualty Ins. Guaranty Corp. v. Yanni,* 397 Md. 474, 480–81, 919 A.2d 1, 5 (2007); *Standard Fire Ins. Co. v. Berrett,* 395 Md. 439, 451, 910 A.2d 1072, 1079 (2006). On appeal from an order entering summary judgment, we review "only the grounds upon which the trial court relied in granting summary judgment." *Rodriguez,* 400 Md. at 70, 926 A.2d at 754, quoting *Standard Fire,* 395 Md. at 450, 910 A.2d at 1079; *Eid v. Duke,* 373 Md. 2, 10, 816 A.2d 844, 849 (2003), quoting *Lovelace,* 366 Md. at 695, 785 A.2d at 729.

## Introduction

We are asked to consider in the present case the implications of a fee sharing agreement, and whether such an agree-

ment may give rise to actionable contract and tort duties between co-counsel, other than those related to the fee itself.

The sharing or division of fees between attorneys appears to have deep historical roots, stemming from English custom:

> The genesis of such a referral or finder's fee in America may well be traceable to the practice of countryside solicitors in England who, when faced with litigation, would associate London solicitors as agents. An agent would in turn retain a barrister from the Inns of Court to take full charge of the litigation, with the custom being that the referring solicitor would share in one-third of the resulting fee.

Thomas J. Hall & Joel C. Levy, *Intra–Attorney Fee Sharing Arrangements,* 11 Val. U.L.Rev. 1, 2 (1976) (footnote omitted). Although during that period, fee sharing between attorneys involving merely the referral of clients appears to have been accepted, by 1937 the American Bar Association expressly recognized that an attorney's payment of a "referral or finder's fee" to another was problematic, unless there was a division of responsibility, as witnessed in Canon 34, which stated:

> No division of fees for legal services is proper, except with another lawyer, based upon a division of service or responsibility.

*Id.* at 5, quoting ABA Canons of Professional Ethics No. 34, as adopted by the American Bar Association House of Delegates in 1937. The iteration of Rule 1.5(e) of the Maryland Rules of Professional Conduct (MRPC), in effect at the time the fee sharing agreement with which we are concerned was executed,[4] reflects the notion that fee splitting between attorneys must have been in proportion to the work performed by each

---

4. Rule 1.5(e) was adopted by this Court on April 15, 1986 and took effect on January 1, 1987. The provision was subsequently amended by Rules Order dated February 8, 2005, effective July 1, 2005. We recite the prior iteration of Rule 1.5(e) in effect in 2004 when the fee sharing agreement in question was executed.

attorney, or if consented to by the client, each lawyer could assume joint responsibility:

> (e) A division of fee between lawyers who are not in the same firm may be made only if:
>
> (1) the division is in proportion to the services performed by each lawyer or, by written agreement with the client, each lawyer assumes joint responsibility for the representation;
>
> (2) the client is advised of and does not object to the participation of all the lawyers involved; and
>
> (3) the total fee is reasonable.

See also Attorney Grievance v. Chasnoff, 366 Md. 250, 264, 783 A.2d 224, 232 (2001) (noting that the purpose of restrictions on fee splitting is "to avoid brokering in clients"), citing C. Wolfram, *Modern Legal Ethics* § 9.2.4, at 510 (1986). Rule 1.5(e) is substantially similar to its predecessor, DR 2–107, except for the addition that the client must agree to the division of the fee in writing under certain circumstances. See, e.g., Vogelhut v. Kandel, 308 Md. 183, 189–90, 517 A.2d 1092, 1095 (1986) (interpreting DR 2–107).

It is with this background that we review the fee sharing agreement in question.

**Discussion**

The gravamen of the issue is whether, pursuant to the fee sharing agreement, Littlepage owed various duties under contractual and tort principles to Blondell, other than to proportionally split the fee.

*A. Breach of Contract*

█ Blondell seeks to recover from Littlepage for breach of contract, positing two theories. First, Blondell asserts that the fee sharing agreement imposed a duty of good faith and fair dealing, implied in all contracts. Second, Blondell argues that the agreement created a joint venture, giving rise to fiduciary duties accompanying that relationship. Blondell asserts that Littlepage breached these duties by engaging in "self-dealing," "withholding material information" regarding the settlement, and "surreptitiously convincing" the Corbins to pursue a malpractice claim against him.

Clearly, because we are bound in contract interpretation by the "four corners" of the agreement, *Clancy v. King,* 405 Md. 541, 556–57, 954 A.2d 1092, 1101 (2008), quoting *Cochran v. Norkunas,* 398 Md. 1, 16–17, 919 A.2d 700, 709–10 (2007), citing *Walton v. Mariner Health of Maryland, Inc.,* 391 Md. 643, 660, 894 A.2d 584, 594 (2006), our focus in the first instance, is the "Acknowledgment and Consent to Fee–Sharing Agreement":

> Pursuant to the applicable Rules of Professional Conduct, I/we, the undersigned, do hereby acknowledge that I/we have been advised by the law firm of Diane M. Littlepage, Esquire that the legal fee in my/our case will be shared between Diane M. Littlepage, Esquire and William Blondell, Esquire on the basis of the anticipated division of services to be rendered in the case. I/we understand that Diane M. Littlepage, Esquire will have primary responsibility for the [sic] prosecuting my/our claim, including handling court appearances and the trial of the case, should such become necessary, and that, William Blondell, Esquire will act as co-counsel in the case and will perform other services as requested by Diane M. Littlepage, Esquire. I/we hereby consent to the sharing of the fee and understand that the fee-sharing agreement will have NO effect on the overall fee to be charged in my/our case.

The clear and unambiguous terms of the fee sharing agreement provide that Blondell and Littlepage will share in any fee based upon "the anticipated division of services to be rendered" and that Littlepage would assume "primary responsibility" for prosecuting the Corbin claim, and that Blondell would act as "co-counsel," performing services "as requested" by Littlepage.

While it is true that a contract in Maryland gives rise to an implied duty of good faith and fair dealing, *Clancy,* 405 at 565–66, 954 A.2d at 1106–07, that duty concerns the "performance and enforcement" of the contract itself. 2 *Corbin on Contracts,* § 5.27 at 139 (Rev. Ed. 1995); 23 *Williston on Contracts,* § 63.21 at 498 (4th ed. 2002). The rationale for

relating the implied covenant of good faith and fair dealing to the purpose of the contract was succinctly articulated in dicta in *Eastern Shore Markets, Inc. v. J.D. Associates, Ltd.*, 213 F.3d 175 (4th Cir.2000), in which the Fourth Circuit quoted from *Parker v. Columbia Bank*, 91 Md.App. 346, 366, 604 A.2d 521, 531 (1992), from our intermediate appellate court:

> [T]he covenant of good faith and fair dealing "does not obligate a [party] to take affirmative actions that the [party] is clearly not required to take under [the contract]." *Parker v. Columbia Bank*, 91 Md.App. 346, 604 A.2d 521, 531 (1992) (addressing duty of good faith and fair dealing in contracts between lender and borrower). Rather, the duty "simply prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract." *Id.* . . . In short, while the implied duty of good faith and fair dealing recognized in Maryland requires that one party to a contract not frustrate the other party's performance, it is not understood to interpose new obligations about which the contract is silent, even if inclusion of the obligation is thought to be logical and wise. An implied duty is simply a recognition of conditions inherent in expressed promises.

*Id.* at 182–84 (alterations in original). The duty of good faith and fair dealing was fulfilled in the present case, therefore, because, "[t]here is no dispute that Littlepage delivered to Blondell his proportionate share of the settlement, thus fulfilling her obligation to Blondell under the agreement."[5] *Blondell v. Littlepage*, 185 Md.App. 123, 148, 968 A.2d 678, 692 (2009).

▪ An analysis of Blondell's breach of contract claim under joint venture or partnership[6] principles also fails.

---

**5.** Blondell asserts that Littlepage delayed in remitting his share of the fee, but acknowledges that this delay is not the basis of his breach of contract claim.

**6.** Section 9A–202(a) of the Corporations and Associations Article, Maryland Code (1975, 2007 Repl.Vol.), describes a partnership and joint venture interchangeably:

Blondell makes much of the fact that he and Littlepage "agreed to an equal division of the fee," thereby allegedly forging a joint venture or partnership, with attendant fiduciary duties. Section 9A–202(d) of the Corporations and Associations Article, Maryland Code (1975, 2007 Repl.Vol.), expressly provides, however, that the sharing of profits "does not by itself establish a partnership." *See also M. Lit, Inc. v. Berger,* 225 Md. 241, 247, 170 A.2d 303, 306 (1961) ("The mere sharing of profits is not in itself sufficient to create a partnership. . . .").

In addition, the fee sharing agreement established the respective obligations of Littlepage and Blondell, namely that Littlepage was primarily responsible for handling the Corbin matter, and Blondell would perform tasks delegated by Littlepage and share in any fee she recovered. Littlepage fulfilled her obligation under the agreement when she paid Blondell his proportionate share of the fee; again, as our intermediate appellate court noted, "[n]othing in the agreement required Littlepage to consult and communicate with Blondell." 185 Md.App. at 151, 968 A.2d at 694.

Blondell, nevertheless, asserts that we should determine that a joint venture was implicated in his dealings with Littlepage, supporting a fiduciary duty owed, because "[o]ther courts have concluded that where two attorneys agree to split a fee a joint venture is created," citing *Karchmar v. Nevoral,* 302 Ill.App.3d 951, 236 Ill.Dec. 378, 707 N.E.2d 223 (1999). In *Karchmar,* a Mr. Marshall retained an attorney named Karch-

---

(a) *In general.*—Except as otherwise provided in subsection (c) of this section, the unincorporated association of two or more persons to carry on as co-owners a business for profit forms a partnership, whether or not the persons intend to form a partnership and whether or not the association is called "partnership", "joint venture", or any other name.

*See also Wildwood Medical Center, L.L.C. v. Montgomery County,* 405 Md. 489, 498–99, 954 A.2d 457, 463 (2008) (describing a partnership as "an association of 'two or more persons' who 'carry on as co-owners' in a mutually beneficial business relationship . . . 'whether or not [it] is called partnership, joint venture, or any other name.' "), quoting Md. Code (1975, 2007 Repl.Vol.), Sections 9A–101(i) and 9A–202(a) of the Corporations and Associations Article.

mar to file a personal injury claim after the tractor trailer he was driving overturned, rendering him a quadriplegic. Karchmar referred the matter to another lawyer, Nevoral, orally agreeing to share fees on a fifty-fifty basis. Karchmar later agreed in writing to a modification, reducing his fee to one-third. *Id.* at 225. After a jury verdict in the amount of $8.2 million, the Illinois intermediate appellate court reversed the judgment and remanded for a new trial. Mr. Marshall, there-after, signed a new agreement with Nevoral, renouncing all prior fee agreements and providing that Marshall would pay Nevoral forty percent of any amount recovered, and that any claims arising for fees and expenses incurred by Karchmar were "to be resolved by Nevoral." *Id.*

When Mr. Marshall's claim was settled for $3.5 million, Nevoral received the entire fee, and Karchmar filed suit for breach of fiduciary duty, to recover his share of the fees obtained in the settlement. *Id.* at 225. In reversing the grant of summary judgment in favor of Nevoral, the Illinois interme-diate appellate court reasoned that, "[a]n agreement between two attorneys to share fees creates a joint venture and there-fore a fiduciary duty of honesty and good faith to disclose to each other all matters affecting their joint representation." *Id.* at 226, citing *Holstein v. Grossman,* 246 Ill.App.3d 719, 186 Ill.Dec. 592, 616 N.E.2d 1224 (1993).[7] Without discussing the factual predicates relied upon for the creation of a joint venture, the court concluded that a factual question remained regarding whether Karchmar was indeed fired by Mr. Mar-shall prior to settlement, as Nevoral claimed, and therefore reversed the entry of summary judgment. *Id.* at 227.

---

7. In *Holstein v. Grossman,* 246 Ill.App.3d 719, 186 Ill.Dec. 592, 616 N.E.2d 1224, 1226 (1993), an attorney, Holstein, allegedly entered into an "oral fee-referral agreement" with another lawyer, Grossman, in which Holstein was to refer personal injury cases to Grossman's law firm in exchange for a one-half share of any attorney fees. The Illinois intermediate appellate court determined that whether the fee sharing arrangement, in which the attorneys agreed to share fees and assume equal responsibility for the services rendered, created a joint venture, remained a fact question. *Id.* at 1237–38.

More important to our analysis in the present case, however, is the fact that only three months after the *Karchmar* decision was filed, the same court expressly recognized that the mere sharing of fees by attorneys does not support the existence of a joint venture and emphasized that participation and authority over the representation by both attorneys is determinative. In *Canel and Hale, Ltd. v. Tobin*, 304 Ill. App.3d 906, 238 Ill.Dec. 64, 710 N.E.2d 861 (1999), an attorney, Tobin, referred a medical malpractice case to the Canel and Hale law firm, pursuant to a "fee disclosure form" signed by the clients, although the firm was discharged prior to a settlement by the clients. *Id.* at 866. The law firm filed suit against Tobin, seeking to recover its share of the fee and asserted that a "joint venture" was created by the fee sharing agreement, which contained language remarkably similar to that at issue here:

> [P]laintiff was to be "primarily responsible for the preparation and resolution of the [clients'] claim, plaintiff would from time to time require assistance from [defendant]...."
> The form further provided that plaintiff and defendant Tobin "are both responsible to see that [the clients'] claim is properly handled." Furthermore, the disclosure form indicated that defendant Tobin was to receive a portion of plaintiff's fee.

*Id.* at 870–71 (third alteration in original). The court reasoned that the fee sharing agreement failed to create a joint venture with attendant fiduciary duties, because of the disproportionate participation in and responsibility for the representation by the law firm:

> Plaintiff was to do a disproportionate amount of work. Plaintiff and defendant Tobin were not acting as co-counsel for the [clients]; plaintiff had a disproportionate amount of control over the handling of the case. The parties engaged in no shared decision-making or shared work for the benefit of the [clients]. They did not even share the costs—only the profit. Therefore, there was no joint venture here and, thus, no fiduciary duty owed.

*Id.* In the present case, Blondell asserts that the fifty-fifty division of the fee with Littlepage evinces that "the parties envisioned more active participation" by Blondell, suggesting the existence of a joint venture. As in *Tobin,* however, the fee sharing agreement here gave Littlepage "primary responsibili-. ty" for prosecuting the Corbins' claim and enabled her to determine the level of Blondell's involvement, so that a joint venture, even under the Illinois intermediate appellate court's interpretation, would not exist.

*Krebs v. Mull,* 727 So.2d 564 (La.Ct.App.1998), also relied upon by Blondell, is persuasive for the proposition that only with active participation and responsibility would a joint venture so exist. In that case, an attorney, Krebs, was retained by two clients, who suffered from hemophilia and had contracted AIDS from blood transfusions. *Id.* at 565. Krebs enlisted the aid of Lorraine and Thomas Mull, and their law firm Mull & Mull, in preparation for trial, and all three attorneys agreed to jointly handle additional hemophilia—AIDS cases. When Thomas Mull allegedly "invited" the clients to discharge Krebs, Krebs filed a claim alleging "trade libel," tortious interference with contract, "invasion of business interest," and unjust enrichment against the Mulls. *Id.* at 565–66. In reversing the trial court's dismissal of Krebs' claims, the Louisiana intermediate appellate court determined that Krebs, Mull, and Mull had forged a joint venture, because the attorneys had agreed to share equally in the proceeds of the hemophilia—AIDS cases, as well as actively participate in the preparation and trial of the cases and contribute to the costs of the litigation. *Id.* at 568–69. Even this holding has been disapproved to the extent that the Louisiana Supreme Court later renounced the existence of a fiduciary obligation between two attorneys arising from a fee sharing agreement. *Scheffler v. Adams and Reese, LLP,* 950 So.2d 641, 653 n. 10 (La.2007).

As a result, assuming that a joint venture could be established between attorneys and further assuming that a fiduciary duty could arise, we determine that Blondell and Littlepage did not equally share representation responsibilities as well as

authority over the case, pursuant to the fee sharing agreement, and Blondell's breach of contract action fails.

## B. Negligence and Fraudulent Concealment

 Blondell similarly asserts, regarding his negligence and fraudulent concealment counts, that Littlepage owed duties of communication and disclosure to him concerning her advice to the clients that Blondell may have delayed fatally in filing their claim, thereby creating an issue that diminished the settlement value of the case, and in suggesting that the clients pursue a potential malpractice action against Blondell.

 As a threshold matter, one of the essential elements of causes of action in negligence and fraudulent concealment is the existence of a duty between the parties. As we recently reiterated in *Lloyd v. GM*, 397 Md. 108, 916 A.2d 257 (2007):

> A complaint alleging negligence must contain the following elements: (1) *that the defendant was under a duty to protect the plaintiff from injury*, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty.

*Id.* at 131–32, 916 A.2d at 270–71 (emphasis added) (quotation marks omitted), quoting *Valentine v. On Target*, 353 Md. 544, 549, 727 A.2d 947, 949 (1999); *BG & E v. Lane*, 338 Md. 34, 43, 656 A.2d 307, 311 (1995), citing *Rosenblatt v. Exxon*, 335 Md. 58, 76, 642 A.2d 180, 188 (1994). Similarly, the essential elements of a claim of fraudulent concealment include:

> (1) *the defendant owed a duty to the plaintiff to disclose a material fact*; (2) the defendant failed to disclose that fact; (3) the defendant intended to defraud or deceive the plaintiff; (4) the plaintiff took action in justifiable reliance on the concealment; and (5) the plaintiff suffered damages as a result of the defendant's concealment.

*Lloyd*, 397 Md. at 138, 916 A.2d at 274 (emphasis added) (quotation marks omitted), quoting *Green v. H & R Block*, 355 Md. 488, 525, 735 A.2d 1039, 1059 (1999).

With respect to determining whether a duty exists, we often have recourse to the definition in W. Page Keeton, et al., *Prosser and Keeton on The Law of Torts* § 53 (5th ed. 1984), which characterizes "duty" as "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." *Gourdine v. Crews,* 405 Md. 722, 745, 955 A.2d 769, 783 (2008), quoting *Patton v. USA Rugby,* 381 Md. 627, 636–37, 851 A.2d 566, 571 (2004). *See also Pendleton v. State,* 398 Md. 447, 461, 921 A.2d 196, 204–05 (2007); *Doe v. Pharmacia & Upjohn Company, Inc.,* 388 Md. 407, 415, 879 A.2d 1088, 1092 (2005); *Hemmings v. Pelham Wood Ltd. Liab. Ltd. P'ship,* 375 Md. 522, 536, 826 A.2d 443, 451 (2003); *Todd v. MTA,* 373 Md. 149, 155, 816 A.2d 930, 933–34 (2003); *Ashburn v. Anne Arundel County,* 306 Md. 617, 627, 510 A.2d 1078, 1083 (1986). In essence, the determination of whether an actionable duty exists represents a policy question of whether the specific plaintiff is entitled to protection from the acts of the defendant. *Pendleton,* 398 Md. at 461, 921 A.2d at 205, quoting *Rosenblatt,* 335 Md. at 77, 642 A.2d at 189 (reasoning that "ultimately, the determination of whether a duty should be imposed is made by weighing the various policy considerations and reaching a conclusion that the plaintiff's interests are, or are not, entitled to legal protection against the conduct of the defendant.").

In *Jacques v. First Nat'l Bank,* 307 Md. 527, 515 A.2d 756 (1986), we had occasion to consider the nature of a duty and considerations of the relationship of the parties and foreseeability:

The duty with which we are here concerned is a duty imposed by law as a matter of sound policy, for the violation of which a person may be held to respond in damages in tort. This duty is conveniently, if not lyrically, referred to as a "tort duty." A tort duty does not always coexist with a moral duty. Neither must a duty imposed by statute necessarily create a tort duty. Nor does a duty assumed or implied in contract by that fact alone become a tort duty.

The mere negligent breach of a contract, absent a duty or obligation imposed by law independent of that arising out of

the contract itself, is not enough to sustain an action sounding in tort.

Still, while every contractual duty does not also impose a tort duty, [w]here a contractual relationship exists between the persons and at the same time a duty is imposed by or arises out of the circumstances surrounding or attending the transaction, the breach of such duty is a tort and the injured party many have his remedy by an action on the case, or he may waive the tort and sue for breach of contract.

In determining whether a tort duty should be recognized in a particular context, two major considerations are: the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties. Where the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability. This intimate nexus is satisfied by contractual privity or its equivalent. By contrast, where the risk created is one of personal injury, no such direct relationship need be shown, and the principle determinant becomes foreseeability.

*Id.* at 533–35, 515 A.2d at 759–60 (citations and footnote omitted) (alteration in original).

 In *Gourdine,* 405 Md. at 745–46, 955 A.2d at 783, quoting *Patton,* 381 Md. at 637, 851 A.2d at 571 (citations omitted), we discussed the interrelationship of duty and foreseeability, of primary importance in instances of personal injury:

Where the failure to exercise due care creates risks of personal injury, "the principal determinant of duty becomes foreseeability." The foreseeability test "is simply intended to reflect current societal standards with respect to an acceptable nexus between the negligent acts and the ensuing harm." In determining whether a duty exists, "it is important to consider the policy reasons supporting a cause of action in negligence. The purpose is to discourage or encourage specific types of behavior by one party to the

benefit of another party." "While foreseeability is often considered among the most important of these factors, its existence alone does not suffice to establish a duty under Maryland law."

We continued that "[d]uty requires a close or direct effect of the tortfeasor's conduct on the injured party," as acknowledged by Prosser and Keeton:

"The rule that you are to love your neighbor becomes in law, you must not injure your neighbor; and the lawyer's question, Who is my neighbor? receives a restricted reply. You must take reasonable care to avoid acts or omissions which you can reasonably foresee would be likely to injure your neighbor. Who, then, in law is my neighbor? The answer seems to be persons who are so closely and directly affected by my act that I ought reasonably to have them in contemplation as being so affected when I am directing my mind to the acts or omissions which are called in question."

*Id.* at 746–47, 955 A.2d at 784, quoting Keeton, et al., *Prosser and Keeton on The Law of Torts* at Section 53, quoting *Donoghue v. Stevenson,* 1 Q.B. 491 (1893); *see also* Dan B. Dobbs, *The Law of Torts* § 229 (2000) ("Relationship of the parties is so pervasively important in determining existence and measure of duty that it often goes unmentioned.").

We concern ourselves here, then, with whether there was that level of "intimate nexus" between Blondell and Littlepage to support the existence of a duty to warrant any remuneration for economic loss, outside of any allegedly related to his fee, which is not in issue. With respect to any personal injury recovery, we ask whether under the circumstances presented, it was reasonably foreseeable by Littlepage that Blondell would suffer the injuries he is alleged to have incurred.

Under the "intimate nexus" test, as well as in the consideration of the foreseeability question, actionable duties of consultation and communication cannot be derived in the instant case, because any duty owed by Littlepage to Blondell is circumscribed by the fee sharing agreement. The agreement among the parties directly contradicts the existence of those

duties, because Littlepage unilaterally was to determine whether to request Blondell's services; Blondell had conceded at the inception any necessity of consultation and its attendant communication between him and Littlepage.[8]

▪ We also decline to elevate the Littlepage—Blondell fee sharing relationship to a closer association warranting imposition of the duties of consultation and communication based upon Rule 1.5 of the Rules of Professional Conduct, not only because the Rules do not support the imposition of civil liability,[9] but also because Rule 1.5 itself does not support the

---

8. Blondell cites *Walpert, Smullian & Blumenthal v. Katz,* 361 Md. 645, 762 A.2d 582 (2000), and *Chicago Title Insurance Co. v. Allfirst Bank,* 394 Md. 270, 905 A.2d 366 (2006), as support for the proposition that the fee sharing agreement created a "sufficient intimate nexus" warranting the imposition of duties of consultation and disclosure.

In *Walpert,* we recognized a duty of care owed by an accounting firm, WS & B, to a third party, Mr. and Mrs. Katz, who relied upon financial statements and audits prepared by WS & B accountants in extending sizeable loans to a business that ultimately failed. 361 Md. at 649–51, 762 A.2d at 584–85. In so holding, we emphasized that the duty was derived from the specific conduct of WS & B accountants in supplying audits, reports, and other information regarding the financial health of the business during face to face meetings with the Katzses and in anticipation of them making the loans. *Id.* at 693–94, 762 A.2d at 608–09. *Walpert* clearly supports the notion that the composition of a duty is derived from the specific purpose of the relationship.

In *Chicago Title,* we recognized a duty of care owed by a depository bank, Farmers Bank, to a non-customer drawer of a check, First Equity, regarding an improperly deposited check representing payment for an outstanding line of credit. *Chicago Title,* 394 Md. at 275, 905 A.2d at 368. In recognizing the existence of a duty of care, we expressly emphasized that the duty owed by Farmer's Bank was limited to "a specific entity, First Equity, for this specific transaction." *Id.* at 299–300, 905 A.2d at 383. Again, *Chicago Title* recognized that the finding of any duty is circumscribed by the relationship of the parties.

9. A *violation of the Rule regarding fee sharing may not serve as a basis* for civil liability, as expressed in the preamble to the Rules of Professional Conduct:

Violation of a Rule does not itself give rise to a cause of action against a lawyer nor does it create any presumption that a legal duty has been breached. In addition, violation of a Rule does not necessarily warrant any other non-disciplinary remedy, such as disqualification of a lawyer in pending litigation. The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct

recognition of such a duty. The intended beneficiary of Rule 1.5 is the *client*, for whom disclosure is mandated, rather than co-counsel.

Further, to impose a duty on Littlepage that she should have foreseen that her failure to consult and communicate with Blondell, would affect his ability to ever speak to his client, which in and of itself may not necessarily constitute a basis for recoverable damages, is not warranted. It may be, as Blondell has alleged, that he has suffered injuries apart from a lessened fee; because, however, Littlepage was to determine the level of Blondell's involvement, solely as a matter of her own prerogative, as Blondell *had agreed* and disclosed to the Corbins, she could not reasonably be expected to have foreseen that the *lack* of communication and disclosure would injure Blondell in the way specified.

As a result, we hold that the duties of consultation and communication that Blondell alleges in his negligence and fraudulent concealment counts are not extant.

### C. Intentional Interference with Economic Relationship

■■ Finally, Blondell asserts that he may maintain a cause of action for intentional interference with an economic relationship, because Littlepage "poisoned" his relationship with the Corbins by "defaming Blondell," "inducing the settlement," and "encouraging the Corbins" to pursue a malpractice action against Blondell. Littlepage counters that Blondell's intentional interference with an economic relationship claim must fail, because she was a party to the agreement with the Corbins.

■■■ In *Kaser v. Financial Protection Marketing, Inc.*, 376 Md. 621, 831 A.2d 49 (2003), Judge John C. Eldridge,

through disciplinary agencies. They are not designed to be a basis for civil liability.
*See also Post v. Bregman*, 349 Md. 142, 168–70, 707 A.2d 806, 819 (1998).

writing for this Court, described the tort of intentional interference with contractual or business relationships as follows:

"[T]he two general types of tort actions for interference with business relationships are inducing the breach of an existing contract and, more broadly, maliciously or wrongfully interfering with economic relationships in the absence of a breach of contract. The principle underlying both forms of the tort is the same: under certain circumstances, a party is liable if he interferes with and damages another in his business or occupation."

*Id.* at 628, 831 A.2d at 53, quoting *Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 69, 485 A.2d 663, 674 (1984). A claim for intentional interference with contractual or business relations requires the following elements:

(1) intentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting.

*Id.* at 628–29, 831 A.2d at 53 (quotation marks omitted). Judge Eldridge further discussed the necessity that the defendant not be a party to the economic relationship:

The requirement that the defendant not be a party to the contract or business relations is traceable to the first case recognizing the tort of intentional interference with contract, the seminal English case of *Lumley v. Gye* [1853] 2 El. & Bl. 216, 118 Eng. Rep. 749, 22 L.J.Q.B. 463. In *Lumley*, the defendant persuaded an opera singer to breach her contract with the plaintiff's theater in order to perform at his theater instead. The plaintiff clearly had a breach of contract action against the opera singer; however he had no previously recognized claim against the party who induced the breach. Nevertheless, a divided court recognized that the plaintiff had a cause of action against the third-party theater owner for intentional interference with contract.

*Id.* at 630–31, 831 A.2d at 54 (alteration in original); *see also K & K Management v. Lee,* 316 Md. 137, 156, 557 A.2d 965, 974 (1989) ("This Court has never permitted recovery for the tort of intentional interference with a contract when both the defendant and the plaintiff were parties to the contract.") (internal quotation marks omitted); Keeton, et al., *Prosser and Keeton on The Law of Torts* at Section 129 ("The defendant's breach of his own contract with the plaintiff is of course not a basis for the tort.").

In the present case, the Corbins, Blondell and Littlepage were parties to the fee sharing agreement. Littlepage agreed to undertake "primary responsibility" for the representation and to fee share with Blondell; Blondell, in turn, agreed to perform services "as requested" by Littlepage. Littlepage, then, under well-established principles, could not intentionally interfere with a contractual or economic relationship to which she was a party.

Blondell, nevertheless, refers to *Cavicchi v. Koski,* 67 Mass. App.Ct. 654, 855 N.E.2d 1137 (2006), for the proposition that an intentional interference claim could be maintained against Littlepage. In that case, an attorney, John Cavicchi, succeeded in having his client's conviction vacated and was, thereafter, retained by the client to represent him in an anticipated civil suit for wrongful incarceration. *Id.* at 1140. Cavicchi and another attorney, William Koski, agreed to jointly represent the client in the civil matter, and both entered into a written contingent fee agreement with the client governing the civil claim. The client later discharged Cavicchi and refused to pay him for services rendered in the prior criminal case. *Id.* at 1140–41. Cavicchi filed suit against Koski, alleging interference with a contractual or business relationship, asserting that Koski induced the client to fire Cavicchi in the civil matter and to withhold payment of his fee in the criminal case. *Id.* at 1141.

The Massachusetts intermediate appellate court recognized a cause of action based upon Koski's alleged interference by improper means with Cavicchi's right to be paid a fee stem-

ming from the prior criminal case. *Id.* at 1144. This determination is entirely consistent with our jurisprudence, because Koski, to whom a fee was not owed in the criminal matter, apparently by "improper motive or means" induced the client to refuse to pay Cavicchi's fee in the criminal case. *Id.* In addition, to the extent that the Massachusetts court recognized a cause of action for intentional interference in connection with Koski's alleged interference causing the client's discharge of Cavicchi in the civil case, the court apparently did not even consider whether Cavicchi and Koski were both parties to the agreement. To the extent that the case could be construed as permitting a cause of action for intentional interference with contractual or business relations, we disagree, because this Court has expressly disavowed such a cause of action, when the alleged offender is a party to the economic relationship, as here. *See, e.g., Kaser,* 376 Md. at 639, 831 A.2d at 59–60; *K & K Management,* 316 Md. at 156, 557 A.2d at 974; *Wilmington Trust Co. v. Clark,* 289 Md. 313, 329, 424 A.2d 744, 754 (1981). Thus, we affirm the entry of summary judgment in favor of Littlepage on the intentional interference with a contractual or economic relationship claim.

Therefore, we decline to recognize those duties of consultation, communication, and disclosure as alleged by Blondell to be attendant to the fee sharing agreement with Littlepage. We also determine that Littlepage did not breach the fee sharing agreement with respect to good faith and fair dealing, nor did she tortiously interfere with Blondell's contractual or economic relationship with the Corbins. We, therefore, affirm.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.**

BELL, C.J., dissents and files opinion.

Dissenting Opinion by BELL, Chief Judge.

In this case, the majority holds, responding to the questions presented by the petitioner, William J. Blondell, Jr., that the respondent, Diane M. Littlepage,

"did not breach the express or implied terms of the contract in question [for joint representation and fee-sharing, to which she was a party with the petitioner], that the fee sharing agreement in issue, as a matter of law, did not give rise to an actionable tort duty of consultation and disclosure between Littlepage and Blondell, and finally, that Littlepage could not tortiously interfere with a contractual or economic relationship to which she was a party."

*Blondell v. Littlepage*, 413 Md. 96, 101, 991 A.2d 80, 83 (2010). I am not at all sure that any one of the majority's answers to the questions is correct,[1] although I am particularly troubled by its final response, which I will address, albeit briefly.

The gravamen of Blondell's intentional interference with contract or economic relationship claim is that Littlepage "poisoned" his relationship with the client. In support of that characterization, he offered evidence that Littlepage "stated [to the clients] her opinion that Blondell unnecessarily delayed filing their claim, thus creating an arguable limitations defense that diminished the value of their claim," *Blondell v. Littlepage*, 185 Md.App. 123, 131, 968 A.2d 678, 682 (2009), advised the clients of the right to proceed against Blondell in a malpractice action and, in fact recommended, with names of possible lawyers for the purpose, that they do so, and the clients, on Littlepage's recommendation, settled the action for

---

1. There can be no doubt that the parties had a contractual relationship. Blondell was retained by the client and, in turn, sought and, as evidenced by the Acknowledgment And Consent To Fee–Sharing Agreement, contracted for the assistance of Littlepage as co-counsel, having the "primary responsibility" for prosecuting the claim. That the memorialization of the parties' co-counsel and fee-sharing arrangement also involved and included the client and the terms of the relationship between counsel were not anywhere expressly enumerated, never mind clearly so, does not change the fact that the parties entered into a contract. To me, it is equally clear that, as to that relationship, there was, and necessarily so, an implied obligation on the part of each to deal fairly, honestly and in good faith with the other. If it were otherwise, as this case illustrates, either co-counsel could, with impunity and without fear of consequence, disparage, undermine, and worse, his or her co-counsel. That does not meet the test of common sense or any reasoned jurisprudential approach.

significantly less than the amount sued for. Emphasizing that she was party to the attorney client relationship to which Blondell also was party, Littlepage rejoined and maintained that the cause of action simply does not lie.

The majority sided with Littlepage. *Blondell,* 413 Md. at 126, 991 A.2d at 98. It reasoned:

"In the present case, the Corbins, Blondell and Littlepage were parties to the fee sharing agreement. Littlepage agreed to undertake 'primary responsibility' for the representation and to fee share with Blondell; Blondell, in turn, agreed to perform services 'as requested' by Littlepage. Littlepage, then, under well established principles, could not intentionally interfere with a contractual or economic relationship to which she was a party under well-established principles."

*Id.* To reach this result—indeed the only factual scenario in which this analysis would apply—the majority had to treat the "attorney" part of the attorney-client relationship, notwithstanding that it consisted of two professionally non-related or unaffiliated attorneys, as a single, indivisible unit, in which the relationship of one of the two professionally non-related or unaffiliated attorneys with the clients defined and, in fact, prescribed the limits of the relationship of the other with the clients.[2] That comports neither with reality nor common sense. A co-counsel relationship does not, in my view, negate or foreclose a separate, consistent relationship between each one of the attorneys and the clients. Were the situation

---

**2.** Courts do not, as a matter of course, view co-counsel representation as a single, indivisible unit. For example, when it has been determined that one of the unaffiliated attorneys representing a single client must be disqualified for a conflict of interest, courts do not find automatically that all of the attorneys are disqualified, that they are a single, indivisible unit, and, therefore, must relinquish representation of the client, i.e. impute to them the conflict. Under the majority's holding, however, that is precisely what must logically occur. In reality and in fact, it is quite common for the non-interested counsel to continue the representation, with the interested attorney being relieved of the responsibility. This is so, I believe, because each attorney has a separate relationship with the clients.

reversed, I can not imagine that the clients would be restricted to an action against both attorneys as a unit or that the viability of the clients' cause of action against their attorneys would be made to depend on the relationship they had with one of the co-counsel and the actions of that co-counsel, without any regard to any relationship they may have had with the other or any actions he or she may have engaged in. Moreover, and to me, more important, if the majority is correct, an attorney, without fear of consequences and with impunity, may undermine his or her co-counsel's relationship with the clients and denigrate, without fear of retribution, not simply his or her legal competence but any other attribute or quality upon which a client reasonably relies and without which the client is not likely to be willing to trust. This would be a troubling outcome, especially in a profession where an attorney's livelihood largely rests upon his reputation.